ASSOCIATION FOR the BENEFIT OF NON-CONTRACT EMPLOYEES, Plaintiff,

v.

NATIONAL MEDIATION BOARD, Leverett Edwards, Individually and as Chairman of the National Mediation Board, Francis A. O'Neill, Jr., Individually and as Member of the National Mediation Board, and Howard G. Gamser, Individually and as Member of the National Mediation Board, Defendants.

Civ. A. No. 973-63.

United States District Court District of Columbia.

May 3, 1963.

Supplemental Memorandum May 29, 1963.

Arguello, Giometti, & McCarthy, Alex L. Arguello, San Francisco, Cal., Jerome C. Muys, Washington, D. C., for plaintiff.

John W. Douglas, Asst. Atty. Gen., Donald B. MacGuineas, Harland F. Leathers, Richard S. Beatty, Attys., U. S. Dept. of Justice, for defendants Nat. Mediation Bd. and others.

Milton Kramer and James L. Highsaw, Jr., Washington, D. C., for defendant-intervenor Brotherhood of Railway & Steamship Clerks, Freight Handlers, Express & Station Employes.

YOUNGDAHL, District Judge.

On April 18, 1963, Judge Hart of this court issued a temporary restraining order barring the National Mediation Board from proceeding with an election among certain categories of employees of United Air Lines for the selection of a collective bargaining representative, pursuant to the Railway Labor Act, 45 U. S.C. § 151 et seq, as made applicable to employees of air carriers, 45 U.S.C. §§ 181–188. Ballots had been scheduled to be sent out by mail to the employees on April 22, 1963. The temporary restraining order barred the mailing of these ballots pending the hearing, in this Court, on a motion for a preliminary injunction. This hearing was held on April 24, and this Court continued the temporary restraining order in effect so that the Court could consider fully the written memoranda and oral arguments of counsel and the complex legal issues raised in those arguments before finally issuing its order.

The Court now issues its order, on the basis of the following findings of fact and conclusions of law.

FINDINGS OF FACT

1. This is an action brought by a group of employees of United Air Lines, Inc. (hereinafter called "United"), organized and incorporated under the name "Association for the Benefit of Non-contract Employees," the plaintiff herein. Plaintiff does not seek recognition as a bargaining agent, nor does it want its name on the ballot.

2. On August 24, 1962, the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees (hereinafter called the "Brotherhood"), filed an application with the National Mediation Board pursuant to 45 U.S.C. § 152, Ninth, of the Railway Labor Act, for an investigation of a representation dispute among employees of United. The case was docketed as Case No. R–3590 by the Board. On November 19, 1962, the Mediator assigned by the Board began an investigation of this dispute and checked the authorization cards from thirty-five percent or more of the employees in the craft or class furnished by the Brotherhood in support of its application. As a result of the Mediator's investigation, it was determined that a representation dispute existed among these employees, between two unions, the Brotherhood and the International Association of Machinists (hereinafter called "Machinists"). On December 19, 1962, in accordance with its rules, an election was authorized by the Board, and the Mediator asked United to furnish the names and addresses of eligible employees so the election could be held. Both the Brotherhood and the International sought to be certified as the collective bargaining representative, and both their names appear on the ballot which the Board has prepared.

3. The "craft or class" in which this representation dispute exists is defined by the Board as "Clerical, Office, Stores, Fleet and Passenger Service employees" of United. This "craft or class" was established by the Board in 1947. There are approximately 12,300 employees certified to vote in this election as members of this craft or class. The plaintiff purports to represent 6,400 of these employees. Cards signed by these employees authorizing the plaintiff to represent the employee before the Board are in the possession of the Board. The

Board has made no attempt to verify the number of authorization cards, nor to check the signatures on the cards against the eligible list of voters.

4. The official ballot provides a square in which the voter can mark an "X" if he wishes to be represented by the Brotherhood, another square to be marked if he wishes to be represented by the International, and a blank line where the voter can write the name of an organization or an individual "[i]f you desire to be represented by ANY OTHER ORGANIZATION OR INDIVIDUAL." There is no place on the ballot where a voter could state that he prefers no collective bargaining representation. If a voter should write "no representation" or "no union" on the ballot, the ballot would be counted by the Board as void. The ballots are secret, and returnable by mail.

5. On February 14, 1963, the Board received from the plaintiff a petition asking leave to intervene in the representation dispute and asking that the class or craft grouping be changed either with or without a hearing, and that the form of the ballot be changed to permit the voters to express a preference for no collective bargaining representation. On February 25, 1963, the plaintiff forwarded to the Board a statement which included the following points:

1. We are not seeking recognition as a bargaining agent; we do not want our name on the ballot.

2. We have no intention of becoming a Company union.

3. We are not sanctioned, recognized, or assisted in any way by United Airlines management.

4. Our Association will be dissolved after such time as it has served its purpose.

The Board determined that the plaintiff was not a properly constituted party at interest in the pending dispute, and on March 27, 1963, informed the plaintiff that its petition was dismissed. On April 5, 1963, the plaintiff requested the Board to reconsider its denial of the petition to intervene. On April 12, 1963, the Board denied plaintiff's request for reconsideration. The present suit was filed on April 13, seeking to enjoin the Board from mailing out the ballots on the scheduled date of April 22, 1963.

## CONCLUSIONS OF LAW

Based on the findings of fact heretofore set forth, and for the reasons fully set forth in a memorandum attached hereto, which memorandum is specifically made a part of these findings of fact and conclusions of law, the Court has reached the following conclusions:

1. The Court has jurisdiction over the subject matter of this action.

2. The plaintiff would be irreparably injured by the holding of said election without having an opportunity to express on the ballot a preference for no collective bargaining representation.

3. The balance of convenience is in favor of the plaintiff.

4. The public interest requires a determination of the legality of the above election before the ballots are sent out.

5. The Railway Labor Act, 45 U.S.C. § 151 et seq., requires that there shall be on the above ballots a place where eligible voters may express a preference for no collective bargaining representation.

WHEREFORE, it is by the Court this 3d day of May, 1963,

ORDERED That the plaintiff's motion for a preliminary injunction enjoining the defendant from conducting any election among the "Clerical, Office, Stores, Fleet and Passenger Service employees" of United Air Lines, Inc., in which the form of the ballot does not permit a voting employee to cast a vote against collective bargaining representation shall be and the same is hereby granted, and it is

FURTHER ORDERED That the defendant shall have one week from today's date to show cause why the preliminary injunction above granted shall not be made permanent, and it is

FURTHER ORDERED That the plaintiff's request that the Board shall

conduct a hearing relating to the question of the appropriateness of class or craft of employees among whom the election was to be held, at which hearing the plaintiff could be heard as a party in interest, shall be and the same is hereby remanded to the Board for further consideration in the light of the Court's conclusion that the Railway Labor Act, 45 U.S.C. § 151 et seq. gives employees a right to have a ballot on which they may express a preference for no collective bargaining representation.

## MEMORANDUM

This memorandum shall specifically be considered a part of the findings of fact and conclusions of law, supra.

## I

### Preliminary Injunction

#### 1. Jurisdiction.

■ This action raises serious questions involving the proper interpretation of certain provisions of the Railway Labor Act, 45 U.S.C. § 151 et seq. For the reasons fully set forth in Part II, infra, this Court has jurisdiction to issue a permanent injunction. Wherever equity has jurisdiction to grant an injunction by final decree, it has jurisdiction to grant a preliminary injunction. American Code Co. v. Bensinger, 282 F. 829, 835 (2d Cir. 1922)[1].

#### 2. Appropriateness of Preliminary Injunction.

■ "The award of a preliminary injunction is an extraordinary remedy which will not be granted unless upon a clear showing of probable success and possible irreparable injury to plaintiffs * * *." Societe Comptoir de L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dep't Stores, Inc., 299 F.2d 33, 35 (2 Cir. 1962).

"The award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff. * * * Even in suits in which only private interests are involved the award is a matter of sound judicial discretion, in the exercise of which the court balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction. * * * But where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." Yakus v. United States, 321 U.S. 414, 440, 64 S.Ct. 660, 674, 88 L.Ed. 834 (1944).

"The peaceable settlement of labor controversies, especially where they may seriously impair the ability of an interstate * * * carrier to perform its service to the public, is a matter of public concern. * * * Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." Virginian Ry. Co. v. System Federation No. 40,

[1.] Nor is the present application for a preliminary injunction in any way barred by the fact that another judge of the District Court, as well as the Court of Appeals, have both denied a preliminary injunction in another case which involves the same disputed election, United Airlines, Inc. v. National Mediation Bd., Civil No. 402–63, now on appeal, since it was agreed at oral argument before me that one of the important issues argued before both courts in that case was the question of whether the employer, United Airlines, had standing to enjoin an election among its employees—an issue obviously not in any way involved in the present application, and since it was further agreed that the orders in that case do not indicate the grounds for the two denials. Both courts in the other case may well have decided largely on the basis of this issue of the employer's standing.

Ry. Employees Dep't, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937).

█ Taking into account the above principles, this Court, to grant a preliminary injunction which would bar the National Mediation Board from proceeding with the disputed election, must conclude that the plaintiff may be irreparably injured by the holding of such election; that the balance of convenience favors the plaintiff in the sense that the inconvenience which would flow to it from holding the election is greater than the inconvenience which would flow to the National Mediation Board from postponing the election; that the public interest will be advanced, not injured, by postponing the election; and that the plaintiff has made a clear showing of probable success in the ultimate determination of the merits.

Since the Court in Part II, infra, has decided to reach and determine the ultimate merits of the controversy, and since the Court therein has concluded that the scheduled election, if held, would be illegal under the Railway Labor Act, 45 U.S.C. § 151 et seq., the Court need consider here only the issues of irreparable injury, balance of convenience, and protection of the public interest.

█ a. *Irreparable Injury.* It is almost certain that the plaintiff would be irreparably injured if the scheduled election were to be held. As an association which seeks to have no collective bargaining representation, this association represents employees of United Airlines who do not wish to be joined with other employees who wish collective bargaining representation. The only way that the plaintiff can achieve its aim of having no representation, under the current procedure of the National Mediation Board, is to have a majority of the eligible voters actually refrain from returning a ballot. In that event, the Board will re-

fuse to certify any collective bargaining representative. The chance of such a result, however, is slim, because the Board has refused to state, in its instructions sent to each eligible voter, that such is the Board's policy. Furthermore, even if this Association were to undertake to instruct all of its members not to return any ballot, the Board has not made clear exactly what must be done. Should the voter wishing to vote to have no collective bargaining representation simply fail to return anything? Or should such voter return, empty, either one or both of the two envelopes distributed by the Board—the "mailing envelope" and the "secret envelope marked 'A'"? If one or both of the envelopes should be returned, should the voter place his name and address on the envelope, or should he leave that blank[2]? The procedure which this Association should instruct its members to follow is, therefore, highly ambiguous, and the Board has indicated that it will take no action to correct the ambiguity.

What irreparable injury would result to the plaintiff from trying to follow such an ambiguous procedure? For one thing, for this Association even to *engage* in a campaign to urge employees *not* to vote opens the Association to charges by other employees that the Association employees are in some way opposed to democratic electoral procedures. To be sure, such "Don't vote" campaigns are occasionally thought necessary even in the most democratic of electoral procedures; but there is no doubt that even when necessary, such campaigns may leave the reputations of those conducting the campaign besmirched.

█ In addition, if the Association should not succeed in persuading a majority of eligible voters to refrain from returning their ballots, and the Board were therefore to certify a collective bargaining representative on the basis of the vote, in conformity with its stated

---

2. The "Instructions for Voting by Mail" state: "YOUR BALLOT CANNOT BE COUNTED UNLESS YOU PLACE YOUR NAME AND ADDRESS ON THE MAILING ENVELOPE." (Exhibit 23.)

policy,[3] then there is serious question whether any court would have jurisdiction to examine the legality of the electoral procedure. The Supreme Court has held that in at least one situation, federal District Courts do not have "the power to review the action of the National Mediation Board in issuing the certificate." *Switchmen's Union of North America v. National Mediation Bd.*, 320 U.S. 297, 300, 64 S.Ct. 95, 96, 88 L.Ed. 61 (1943). But see *Air Line Dispatchers Ass'n v. National Mediation Bd.*, 89 U.S.App.D.C. 24, 27–28, 189 F.2d 685 (1951). And see infra, Part II, for further discussion. Such doubts about the availability of another remedy to correct the results of illegal governmental action can constitute part of the basis for a finding of irreparable injury, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72 S.Ct. 863, 866, 96 L.Ed. 1153 (1952), especially when the actual damages, both present and future, are "of such nature as to be difficult, if not incapable, of measurement." *Ibid.* This Court therefore concludes that it is extremely likely that the plaintiff herein would be irreparably injured if the scheduled election were to proceed.

 ▮ b. *Balance of Convenience.* The Board has made only the most general allegations of the inconvenience to it of having the election delayed:

> Delay will be unfair to the Board, which has already spent considerable time and effort assembling timely data necessary to proceed with an election. Much of this effort would be nullified by further delay in the election. (Board's Memorandum in

opposition to plaintiff's motion for preliminary injunction, p. 24.)

This statement is amplified in the affidavit of E. C. Thompson, Executive Secretary of the Board, as follows:

> The Board's records on Case R–3590 show this case has been under active handling by the Board since August 27, 1962 and a dispute was found to exist among the craft or class of employees involved on December 19, 1962. The Board's mediators have spent approximately three months in preparing a list of the eligible employees from the carrier's records due to the refusal of the carrier to furnish that information to the mediators. The eligible list has now been completed and agreed to by the contesting organizations, namely the BRC [the Brotherhood] and the IAM [the International]. The notice of election and ballots have been printed and the mediator is now in the process of preparing the ballots for mailing to the eligible employees. Any further delay at this time would nullify much of the effort expended by the Board to conduct an election. (Affidavit, p. 12.)

The very delays which the Board recounts, however, argue against any severe inconvenience from a further delay, since an election postponed this long can easily wait to have its legality determined. And the fact that the Board has already printed ballots is obviously a trifling argument in the face of the possible irreparable injuries to the plaintiff from the use of those very same ballots. The Court, therefore, concludes that the

---

3. The Board has also argued that there is no irreparable injury because it is not clear that the Board will certify a collective bargaining representative on the basis of the election, and hence that an injunction would be "premature." At the hearing on the motion for a preliminary injunction, however, the Board made clear that the only basis on which it would not certify a representative on the basis of the electoral results was if a majority of eligible voters failed to participate: "Un-

der the practices of the Board there will be no certification of a representative unless a majority of those eligible to vote affirmatively, vote." (Statement of Mr. Leathers at the hearing.) The same policy of the Board was stated in Mr. Thompson's affidavit: "The Board does not issue a certification after a representation election has been held unless a majority of those eligible to participate in the election have cast valid ballots." (Affidavit, p. 11.)

balance of convenience must be resolved in favor of the plaintiff.

■ c. *Public Interest.* The Board's allegations concerning the public interest in a speedy election are similarly general:

> It is in the public interest that the procedures of the [Railway Labor] Act, as applied by the Board in the light of its long and successful experience in railroad and airlines labor relations, should be promptly carried out. * * * The public interest would not be served by an injunction which delays settlement of this dispute. * * * Moreover, the granting of an injunction would injure those parties directly involved in this representation proceeding. The two unions involved are directly concerned. Delay of the election may seriously impair their organizing campaigns, which necessarily depend upon the timing of the election. Delay will also be unfair to the employees who have furnished authorization cards to the unions, indicating their desire to have the issue investigated by the Board and resolved through an election. (Board's Memorandum, supra, p. 22–4.)

There is no showing here of the need for any immediate negotiations between the employer and some collective bargaining representative, nor is there any showing of any threatened strikes or other threat to the continued services of the carrier. Indeed, this Court believes that more bitterness would probably be engendered by the holding of an election, the results of which might later be set aside as illegal, than by postponing the election pending a determination of its legality. In addition, the two unions which are organizing their campaigns should surely be saved the expense of a second campaign which would be necessary if the results of the first election

were set aside as illegal. Since the Board has failed to make a more precise showing that the public interest requires a speedy election, the Court is not intruding upon any preliminary findings which the Board's expertise might have entitled the Board to make; the Court therefore concludes that the interest of the public can best be served by a determination of the legality of the scheduled election now.

Because there is an extreme likelihood that plaintiff would be irreparably injured by the holding of the scheduled election, because the balance of convenience is in plaintiff's favor, and because the public interest requires that the legality of the election be determined before such election is held, the Court, pursuant to Rule 65, Fed.R.Civ.P., will grant a preliminary injunction barring the scheduled election pending the final determination of the merits of this controversy.

## II

### *The Merits*

■ The Board has conceded that the plaintiff seeks, by the motion for preliminary injunction, the ultimate relief requested; indeed, the Board argues on this basis that the motion for a preliminary injunction should be denied, since a preliminary injunction should not be a means of obtaining such relief before a full consideration of the merits. (Memorandum in opposition to plaintiff's motion for preliminary injunction, pp. 18–20.) Normally, of course, such consideration of the merits would be heard later, and a preliminary injunction would issue solely on the basis of irreparable injury, the balance of convenience, and the public interest, as discussed in Part I, supra. In this case, however, the Court deems it appropriate to proceed immediately to the merits of the issues. The Court does so because the merits have been fully briefed and argued on the motion for preliminary injunction,[4] and because there are no disputed facts.

---

4. Some of the Board's argument-headings reveal the full extent to which the merits were briefed: "The Court is Without Jurisdiction Over the Subject Matter;" "Plaintiff's Contentions are Without Merit;" "Plaintiff Lacks Standing to Main-

### 1. *Jurisdiction.*

This is an action seeking a permanent injunction against the holding of an election to select a collective bargaining representative, upon the ground that the procedures of the National Mediation Board in preparing for the election and in soliciting the will of the majority do not conform to procedures required both by the Railway Labor Act, 45 U.S.C. § 151 et seq., and by the due process clause of the Fifth Amendment of the Constitution. This Court has jurisdiction under 28 U.S.C. § 1337[5], since the Railway Labor Act is an act of Congress regulating commerce, Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 553–557, 57 S.Ct. 592, 81 L.Ed. 789 (1937), and since 28 U.S.C. § 1337 requires no monetary jurisdictional amount. Felter v. Southern Pac. Co., 359 U.S. 326, 329 n. 4, 79 S.Ct. 847, 3 L.Ed.2d 854 (1959).

Such general jurisdiction, however, is not sufficient to dispose of the jurisdictional issue, since in cases involving the Railway Labor Act, jurisdiction to review actions of the unions, employers, or the National Mediation Board depends upon the particular issue upon which review is sought.

On the one hand, courts do not have jurisdiction to review the propriety of the Board's definition of the scope of a "craft or class," Switchmen's Union of North America v. National Mediation Bd., 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943), for:

"It has become well settled that in making 'craft or class' determinations, the [Board] may regroup, amalgamate, or splinter 'historic' bargaining groups, taking into account technological and functional changes, and that the decision of the Board in setting up a 'class' for representation in a jurisdictional dispute is unreviewable in the courts." UNA Chapter, Flight Eng'rs' Intern. Ass'n v. National Mediation Bd., 111 U.S.App.D.C. 121, 124, 294 F.2d 905 (1961). Accord, Air Line Stewards and Stewardesses Ass'n, Intern. v. National Mediation Bd., 111 U.S. App.D.C. 126, 294 F.2d 910 (1961), cert. denied, 369 U.S. 810, 82 S.Ct. 687, 7 L.Ed.2d 611 (1962).

Nor do courts have jurisdiction to decide which of two unions seeking to be the collective bargaining representative should have been certified by the Board as the representative of such "craft or class," General Committee of Adjustment of Brotherhood of Locomotive Eng'rs etc. v. Missouri-K.-T. R. R. Co., 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76 (1943).

"Where there is doubt as to representation and where there are rival jurisdictional claims, those doubts are to be resolved and the claims are to be vindicated or rejected not by the courts but by the administrative and other processes provided by the Act." Flight Eng'rs' Intern. Ass'n v. Eastern Air Lines, Inc., 311 F.2d 745, 747 (2d Cir. 1963).

Nor do courts have jurisdiction to decide whether particular employees should or should not have been declared eligible voters in a representation election. Decker v. Linea Aeropostal Venezolana, 103 U.S.App.D.C. 301, 258 F.2d 153

---

tain This Action;" "Even if Plaintiff Were a Party to The Proceeding, It Would Not Be Entitled to a Hearing as to the Craft or Class;" "Plaintiff's Objections to the Form of Ballot are not Sound;" "The Board's Decision to use the Long Established Craft or Class and the Customary Form of Ballot is not Erroneous." It is true, of course, that all of these arguments were sub-arguments under a main heading to the effect that jurisdiction and the right to relief "are Not Clear" and that it "is Unlikely that Plaintiff Will Prevail Upon the Merits." Nevertheless, as the Board itself has conceded, it was forced to deal directly with those merits by virtue of the fact that the ultimate and the preliminary relief are inextricably tied together.

5. "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce * * *." 28 U.S. C. § 1337.

(1958); WES Chapter, Flight Eng'rs' Intern. Ass'n v. National Mediation Bd., 314 F.2d 234 (D.C.Cir.1962).

On the other hand, courts have taken jurisdiction to review actions of the Board where serious issues of constitutionality or of statutory construction were presented. Thus federal courts have taken jurisdiction to decide whether the Railway Labor Act was within the power of Congress to enact and whether such Act required an employer to negotiate with a collective bargaining representative once such representative had been certified by the Board. Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937). And the Supreme Court held that there was jurisdiction to decide whether the Act required the union bargaining representative to represent all employees within the class, regardless of race, thereby reversing lower federal courts which had held there was no such jurisdiction. Tunstall v. Brotherhood of Locomotive Firemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944). The Court in Tunstall specifically distinguished the Switchmen's Union case, 323 U.S. at 213, 65 S.Ct. at 237, for the reasons set forth in the companion case of Steele v. Louisville & N. R. R. Co., 323 U.S. 192, 204–205, 65 S.Ct. 226, 89 L.Ed. 173 (1944). Furthermore, the Court of Appeals has discussed the facts of the Board's procedures before reaching the conclusions that the "investigation" required by the statute, 45 U.S.C. § 152, Ninth, had been held, and that no constitutional question of due process was presented. WES Chapter, Flight Eng'rs' Intern. Ass'n v. National Mediation Bd., supra, 314 F.2d at 237; UNA Chapter, Flight Eng'rs' Intern. Ass'n v. National Mediation Bd., supra. And the Court of Appeals has specifically taken jurisdiction to determine the correctness of a construction of the statute by the Board which limited the statute's geographical scope. Air Line Dispatchers Ass'n v. National Mediation Bd., 89 U.S.App.D.C. 24, 189 F.2d 685 (1951),

cert. denied 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951).

The Air Line Dispatchers case, supra, is highly important in setting the proper context for a resolution of this difficult question of whether or not this Court has jurisdiction over the particular issue presented here. That case carefully discussed the sweeping language of the Switchmen's Union case, supra, 320 U.S. at 300–306, 64 S.Ct. at 96–100, 88 L.Ed. 61, which had severely limited the scope of judicial review over the Board's action, and concluded that a fundamental change had been brought about by the enactment, subsequent to Switchmen's Union, of the Administrative Procedure Act, 5 U.S.C.A. §§ 1001–1011. The Court of Appeals noted that § 10 provides:

"Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion—

(a) Right of Review. Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof." (5 U.S.C.A. § 1009.)

The court went on to say that, although the Administrative Procedure Act was not intended to change existing case law as to particular issues which had previously been held not within judicial cognizance, such broad statements as that in the Switchmen's Union case to the effect that in view of the history of the Railway Labor Act a purpose to afford judicial remedy must plainly appear "should now be read in the light of the purpose of the Administrative Procedure Act subsequently enacted." 89 U.S.App. D.C. at 28, 189 F.2d at 689. The court went on to quote from a document indicating that purpose:

"Legislative intent to forbid judicial review must be, if not specific and in terms, at least clear, convincing, and unmistakable under this bill. The mere fact that Congress has not ex-

pressly provided for judicial review would be completely immaterial." Ibid.

The court concluded that if "the nature of the question" was such as to suggest judicial review, then the Administrative Procedure Act would authorize such review. Ibid.

■ In the light of the Administrative Procedure Act, this Court views "the nature of the question" presented here as urgently requiring judicial review. The question involves a serious issue of statutory construction, possibly rising to constitutional dimensions.

The basic question is whether the Railway Labor Act denies to voters certified as eligible to vote in an election held pursuant to 45 U.S.C. § 152. Ninth, for the selection of a collective bargaining representative, the chance to vote for no representation at all. Although the Board's policy is to refuse to certify any representative if a majority of eligible voters fail to *participate* in the election, the Board construes the statute as forbidding a direct vote for no representation. The Board's position as to the required interpretation of the statute is shown in the italicized portions of the following interchange between the Court and the attorney for the Board at the hearing on the present motion:

THE COURT: "Are you willing, on behalf of the Mediation Board, to have marked on the ballot a statement that the failure to vote will have the same effect as if they had voted 'No' and wished not to be represented by a union?"

MR. LEATHERS: "I don't think I am authorized to make that representation."

THE COURT: "If you say that it is the same, why aren't you willing to agree to it?"

MR. LEATHERS: "I am about to explain this, I think, in this way: *The Mediation Board has taken the position that the language of the statute requires a representative* and that a majority of those—the

Supreme Court has held a majority of those voting are authorized to elect that representative. Now the Mediation Board feels that the form of ballot which they have been using over this long period of time, this form of ballot is not something new, it is not something untried."

THE COURT: "Whether it is something new or old doesn't help us much. The question is whether these people are being deprived of a right which they ought to have, to express their wishes as to whether they should be represented."

MR. LEATHERS: "I think the short answer to that is that the Supreme Court has held that the majority of those actually voting are entitled to choose the representative."

THE COURT: "They claim they have no right to vote at all."

MR. LEATHERS: "No, they have a right to vote. *They just don't have a right to vote for no representation.*"

THE COURT: "Isn't that in effect giving them no right to vote?"

MR. LEATHERS: "No, because they can vote for one of the representatives if they wish to."

THE COURT: "Suppose they don't want to vote for either? They are denied the right to vote on that issue?"

MR. LEATHERS: "Yes, that's right. Understand, they are not denied the right to express their views by refraining from voting."

After quoting from the language of the Supreme Court in Virginian Ry. Co. v. System Federation No. 40, supra, 300 U.S. at 559, 57 S.Ct. 605, Mr. Leathers went on to state:

MR. LEATHERS: "The Supreme Court in that case seems to suggest that the rule here is the same rule as that in any election. In other words, *if you have a chance to elect two Congressmen, there is no chance on the ballot to say I don't want a*

*Congressman at all.* The statute here, [45 U.S.C. § 152. Second] provides for the solution of these disputes by representatives. The Board's function under [45 U.S.C. § 152. Second] is to decide between the two disputants who claim they are representatives. There is nothing in the statute which provides—"

THE COURT: "Is there anything in the statute that indicates that a group who do not want to be represented should not also have the right to express themselves?"

MR. LEATHERS: "I think the Supreme Court has so indicated in the Virginian case."

This Court believes that the legal issue thus squarely posed—whether in a vote for a collective bargaining representative of a "craft or class" designated by the Board, the Railway Labor Act requires that eligible voters shall have no right to cast a ballot against any representation at all—is of great importance and should be resolved by the courts. Indeed, the Board's own reliance on the Virginian case for the merits of its position shows clearly that the Supreme Court has already assumed jurisdiction over an issue which is closely related to—but not identical with—the one presented here.

I therefore conclude that this Court has jurisdiction to review those actions of the Board which reflect the Board's conclusion that the Railway Labor Act forbids a vote for no collective bargaining representation.

2. *Standing.*

 The Board has raised no issue as to whether the plaintiff's members actually are, as alleged in the complaint, "personal service and clerical employees of United Air Lines." The Board's executive secretary has merely stated, by affidavit, that the cards authorizing the plaintiff to speak for its members were,

as of April 22, 1963, being held in the Board's offices, and that:

The [plaintiff] has stated they have presented a total of approximately 6,400 cards. No attempt has been made by the Board to verify this number or to check the signatures on the cards against the eligible list which has been prepared by the mediator for the reasons which are fully explained in Board's letter of March 27, 1963 * * *. (Thompson affidavit, p. 9.)

These reasons came down to one point:

the [plaintiff] does not hold itself out as a representative for the purposes of collective bargaining under the Railway Labor Act, and accordingly, the [plaintiff] cannot be considered by the National Mediation Board as a bona fide intervenor * * *. (Exhibit B, letter of E. C. Thompson, March 27, 1963, p. 3.)

Since this decision of the Board depends completely upon the Board's construction of the statute as barring from formal participation any party not seeking to be an actual collective bargaining representative—as the plaintiff herein does not—the Board's argument on standing is merely another way of stating its position on the merits. Since the Board has made no argument that the plaintiff is not what the plaintiff is alleged to be—an association of employees in the "craft or class" in which the election is to be held—the Board must be deemed to have waived any need on the part of plaintiff to prove its own status in fact, since obviously such factual status, if challenged, would be just as relevant to a motion for preliminary injunction as it would be to the ultimate determination of the merits. The Court therefore concludes that the plaintiff has standing to maintain the action in court as an association composed of employees of United Air Lines who are in the "craft or class" in which the disputed election is scheduled.[6]

6. The Court, of course, is here indicating no opinion as to whether the plaintiff should have been given "standing" by the Board as a formal "intervenor" in the Board's own proceedings.

3. *The Ballot.*

 The Board has construed the Railway Labor Act as forbidding a vote for no collective bargaining representation. This Court believes that this construction by the Board is contrary to one of the stated purposes of Congress in amending the Railway Labor Act in 1934, is not in harmony with the only language of the Supreme Court on the subject, overlooks the importance of freedom of expression on this issue, and is not required by the language of the statute.

45 U.S.C. § 152 provides, in pertinent part, as follows:

"Second. All disputes between a carrier or carriers and its or their employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier or carriers and by the employees thereof interested in the dispute.

"Third. Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. * * *

"Fourth. Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter. No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice * * *.

"Fifth. No carrier, its officers, or agents shall require any person seeking employment to sign any contract or agreement promising to join or not to join a labor organization * * *.

\* \* \* \* \* \*

"Ninth. If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. Upon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this chapter. In such an investigation, the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier. In the conduct of any election for the purposes herein indicated the Board shall designate who may participate in the election and establish the rules to govern the election, or may appoint a committee of three neutral persons who after hearing shall within ten days designate the employees who may participate in the election. * * *

\* \* \* \* \* \*

"Eleventh. Notwithstanding any other provisions of this chapter, * * * any carrier or carriers as defined in this chapter and a labor

organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this chapter shall be permitted—

"(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class * * *."

Several observations must be made about these statutory provisions. The first is that employees have *"the right* to organize and bargain collectively through representatives of their own choosing." Fourth, supra. (Emphasis added.) There is no *requirement* that they bargain collectively. Such freedom to bargain collectively or not is reinforced by the provision that no carrier "shall require any person seeking employment to sign any contract or agreement promising *to join or not to join* a labor organization * * *." Fifth, supra. (Emphasis added.) Only where a carrier and the employers have mutually agreed upon a union shop must an employee agree to join a labor organization. Eleventh, supra. Thus *freedom* of association or non-association is emphasized in the statutory language.

Of course, the statutory scheme does assume that, in most cases, employees *will* bargain collectively. The whole scheme assumes that there are "disputes" between the carrier or carriers on one side, and the employees on the other. Second, supra. The statute then establishes machinery for the determination of who among the employees will be the bargaining representative, Ninth, supra, and requires that the carrier keep out of such machinery. Third, Fourth, Fifth, supra. But if true employer-employee "disputes" do not happen to arise in such an across-the-board fashion, as seems to be the case when there are a variety of different individual agreements between employer and employee negotiated, by the wishes of both parties, on a one-to-one basis, then the assumption behind the statute disappears, and the whole point behind having the collective bargaining representative disappears. The issue in this case is whether employees have a right to vote, in effect, that such employer-employee "disputes" do not happen to exist in their particular category of employment, and whether if the Board decides to hold the "secret ballot" provided in Ninth, supra, such employees have a right to indicate their preference on the ballot?

It is not surprising that the statute as such does not answer this question. Congress, in 1934, was concentrating upon erecting machinery which would *force* reluctant employers to deal with the chosen representatives of their employees. Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 538–549, 57 S.Ct. 592, 81 L.Ed. 789 (1937). There are strong indications, however, that Congress intended employees to be free *not* to associate as well as to associate. Thus the House Committee on Interstate and Foreign Commerce, in reporting the bill containing the 1934 amendments which put teeth in the Act, declared:

2. It provides that employees shall be free to join any labor union of their choice and likewise be free to refrain from joining any union if that be their desire and forbids interference by the carriers' officers with the exercise of said rights. H. R.Rep. No. 1944 to accompany H.R. 9861, 73d Cong., 2d Sess., 2 (1934).

During the hearings on this and related bills, Commissioner Joseph P. Eastman, Federal Co-Ordinator of Transportation and "draftsman of the 1934 amendments," Switchmen's Union, supra, 320 U.S. at 302, 64 S.Ct. at 97, testified as follows:

MR. HUDDLESTON: "Well, as I get your idea it is the purpose of this bill not to coerce organizations and not necessarily to imply an organization."

COMMISSIONER EASTMAN: "No; it does not require collective bargaining on the part of the employees. If the employees do not wish to organize, prefer to deal individually with the management with regard to these matters, why, that course is left open to them, or it should be." Hearings on H.R. 7650 and H.R. 9689 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess., 57 (1934).

And on a similar Senate bill, Senator Wagner, the great champion of the rights of Labor, declared:

SENATOR WAGNER: " * * * I didn't understand these provisions compelled an employee to join any particular union. I thought the purpose of it was just the opposite, to see that the men have absolute liberty to join or not to join any union or to remain unorganized." Hearings on S. 3266. Before the Senate Committee on Interstate Commerce, 73d Cong., 2d Sess., 76 (1934).

Such statements, while not conclusive, strongly support the Court's conviction that employees, under the statute, have a right to vote for no representation.

One thing that is clear in the statute, however, is that the Act gives to the "majority" of any craft or class of employees "the right to determine who shall be the representative * * *." Fourth, supra. Do the present practices of the Board protect the rights of this "majority"? The Board claims they do because if a majority fails to return any ballot, then no representative is certified. But what if slightly *less* than a majority "boycott" the election by failing to return their ballots? Out of 12,000 eligible voters, let us say, suppose that 5,000 "boycott" the election, 4,000 vote for one union, and 3,000 vote for another union. Since a majority of the eligibile voters participated, a representative will be certified. That representative would be the union receiving 4,000 votes. Clearly, this is not majority rule; it is not even plurality rule. But it is the Board's interpretation of what the statute requires. In the Virginian case the Supreme Court accepted the Board's interpretation that if a majority of the eligible voters actually participated, then a majority of those participating could determine who should be certified. But the rationale the Supreme Court used to reach this result is directly contrary to the Board's notion that those voters "boycotting" the election are indicating their preference for no representation. The Supreme Court justified a certification on the basis of majority participation because "[t]hose who do not participate 'are presumed to assent to the expressed will of the majority of those voting.'" 300 U.S. at 560, 57 S.Ct. at 605. (Citations omitted.) That the Supreme Court clearly intended to adopt a construction of the statute which would encourage participation in these elections is shown by its subsequent statement that "[t]here is the added danger that the absence of eligible voters may be due less to their indifference than to coercion by the employer." Ibid. The Board's interpretation of the statute thus encourages the very non-participation which the Supreme Court sought to discourage.

It must be added that in the Virginian case, supra, the Supreme Court did not deal with the issue before the Court in the present case. No issue was raised as to the form of ballot, and neither party was arguing that employees should be permitted to vote for no representation. Indeed, as far as this Court knows, the electoral dispute which is the subject of this case is the first to raise this issue in the courts.[7]

The Board argues that since under 45 U.S.C. § 152, Ninth, supra, the Board

---

7. Radio Officers' Union, C. T. U.-A. F. of L. v. National Mediation Bd., 86 U.S. App.D.C. 319, 181 F.2d 801 (1950) upheld the Board in its refusal to certify a representative on the basis of minority participation. This, indeed, had been the result in the Virginian case in the District Court as to the one craft or class in which a majority had refrained from voting. System Federation, No. 40, etc. v.

may certify a collective bargaining representative without holding an election at all, then "[a] *fortiori,* if the statute does not require an election, it does not require a ballot in any particular form if the Board determines to go ahead with an election." (Board's Memorandum, p. 13.) Obviously, however, such an argument proves too much, since there are some forms of ballot—one, for instance, which left off one of the unions certified to be a party to the dispute—which would be clearly illegal. This Court is merely indicating that *if* the Board decides to conduct its "investigation" by means of a "secret ballot," 45 U.S.C. § 152, Ninth, then that ballot must conform to the requirements of the statute.

In order to protect the vitality of these important electoral processes, this Court has concluded that the Railway Labor Act requires that employees be given the chance to vote directly for no collective bargaining representation. The National Labor Relations Board, under a statute whose language also left the issue open, adopted such a policy early in its history. In refusing to strike from the ballot the words "or by neither" in a campaign between two unions, the NLRB explained its position in terms which apply, as well, to the issue now before the Court:

> The Act, however, does not require an unwilling majority of employees to bargain through representatives. It merely guarantees and protects that right of a majority if it chooses to exercise it. Yet if the opportunity of voting against the organizations named on the ballot were denied, a majority might be forced against its will to accept representation by one or other of the nominees. The policy adopted by the Board is designed merely to make

sure that the votes recorded for a particular representative express a free choice rather than a choice in default of the possibility of expressing disapproval of both or all proposed representatives. * * *

It was contended * * * that the privilege of an employee to indicate that he does not desire either of the named unions to represent him, if it must be preserved, could also be expressed by refraining from voting or by casting a blank ballot. In line with other authorities * * however, we indicated * * * that those not voting would be presumed to acquiesce in the choice of the majority who do vote, and thus the employee who does not desire to be represented by either designated union would not express this preference by refraining from voting. As to the solution of casting a blank ballot, the practice of the Board, again in line with other authorities, has been to hold that a blank ballot is to be regarded as a failure to vote by one qualified to do so. We see no advantage in forcing employees who disapprove of the nominees to adopt the rather ambiguous method of expression involved a casting a blank ballot, when their choice can be clearly indicated by providing a space therefor.

For the reasons which we have outlined, it is the conclusion of the Board that a free expression of the desires of the majority of the employees in the unit found appropriate in the present case demands that the ballot provide for a space in which employees may indicate that they do not desire to be represented by either of the named organizations. Interlake Iron Corp., 4 NLRB 55, 61–2 (1937). (Footnotes omitted.)[8]

Virginian Ry. Co., 11 F.Supp. 621, 628 (D.Va.1935). This part of the lower court's holding was not appealed, and was therefore not before the Supreme Court. 300 U.S. at 559, 57 S.Ct. at 605.

8. It should be noted that this policy of the NLRB was thus adopted long before Congress in express language gave employees under the National Labor Relations Act the right "to refrain from" organizing.

There is a special reason why this Court has concluded that employees under the Railway Labor Act have a statutory right to vote for no representation. Since the scope of the "craft or class" has been committed to the unreviewable discretion of the Board, UNA Chapter Flight Eng'rs' Intern. Ass'n v. National Mediation Bd., 111 U.S.App.D.C. 121, 124, 294 F.2d 905 (1961), the chance for employees to vote for "no representation" is, in instances such as the present one, really the chance to vote against the particular "craft or class" designated by the Board. Such a chance to vote against bargaining collectively with employees performing different functions under different conditions is a necessary safeguard against arbitrary action by the Board. If the courts cannot review the Board's grouping of such crafts or classes, then it is particularly important that the processes for majority determination be kept sharp and unambiguous.

This Court therefore concludes that an injunction should issue barring the Board from proceeding with the scheduled election unless the ballots are changed to provide a space in which the voters can vote for no representation.

Because the Board's position on the other issues raised by plaintiff—requesting a "hearing" on the appropriateness of the class or craft designated, at which the plaintiff would have status as a party-in-interest—depends partly upon the Board's interpretation of the statute as not permitting a vote against representation, the Court will decline to express any opinion on those issues and will instead remand the matter to the Board for further consideration in light of the fact that the Board's interpretation of the statute has been found erroneous. The Court therefore does not reach any constitutional issues of due process.

In the unforeseen event that the Court has failed to give consideration to some argument of the Board which would be relevant to the granting or withholding of a permanent injunction but was not relevant to the granting or withholding of a preliminary injunction, the Court will issue an order, returnable within one week, for the Board to show cause why the preliminary injunction should not be made permanent.

Supplemental Memorandum

On May 3, 1963, this Court granted a preliminary injunction enjoining the defendant National Mediation Board from conducting any election among the "Clerical, Office, Stores, Fleet and Passenger Service employees" of United Air Lines, Inc., in which the form of the ballot does not permit a voting employee to cast a vote against collective bargaining representation. On the same date, this Court also ordered that the defendant have until May 10, 1963, to show cause why the preliminary injunction above granted should not be made permanent.

On May 10, 1963, the defendant filed a motion to dismiss the complaint, or in the alternative for summary judgment. On the same date, the defendant filed a response to the order to show cause, requesting the Court to reconsider and vacate the preliminary injunction above granted, or to stay the preliminary injunction and allow the Mediation Board to conduct the proposed election, and opposing the entry of a permanent injunction.

In support of its various motions, the defendant has submitted an affidavit of Francis A. O'Neill, Jr., a member of the National Mediation Board. Mr. O'Neill has repeated the Board's position as to the long-continued use of this form of ballot, and the time and expense involved in the preparation by the Board of a new list of eligible voters. Obviously, neither of these arguments is sufficient to overcome the Court's previous conclusions, stated in its memorandum of May 3, 1963, that the proposed form of ballot is illegal under the Railway Labor Act, 45 U.S.C. § 151 et seq., and that plaintiffs, with the balance of convenience in their favor, would be irreparably injured by the holding of the election with an illegal form of ballot.

The only argument of Mr. O'Neill's not already made by the Board, and hence not fully considered by the Court in reaching its conclusion to issue the preliminary injunction, is the following:

"In the opinion of the National Mediation Board any requirement that the ballot used in a representation dispute be changed to provide a space in which the voters can vote for no representation will tend to encourage the parties to a representation dispute to resort to self-help rather than to seek the services of the Board in resolving the representation dispute and will result in strikes and unrest in the industries covered by the Railway Labor Act which would not result were the normal form of ballot used."

Implicit in this argument is the assumption that unions will prefer to strike rather than to ask the National Mediation Board to investigate a representation dispute pursuant to 45 U.S.C. § 152, Ninth, if any election held by the Board in the course of such investigation must be by a ballot on which the voter can express a preference for no collective bargaining representation. Why unions would prefer to strike rather than engage in an election campaign culminating in a ballot on which all alternatives are clearly stated is not clear to the Court. The Board already has a policy of refusing to certify a collective bargaining representative if a majority of the eligible voters fail to return valid ballots. The Court has merely held that the ascertainment of the number of voters who prefer no collective bargaining representation must, under the Railway Labor Act, be by means of ballots on which such preference can be expressed clearly and unambiguously. Such an unambiguous procedure for ascertaining majority will is no more an invitation to strikes or "self-help" than is the Board's own present policy. In any event, if such "self-help" were to impair the Board's important functions, then it would be for the Congress to take such action as it deemed appropriate to change the Railway Labor Act.

The Board has made the further argument that the issue of whether the Railway Labor Act's provisions for majority determination of representation disputes requires a ballot on which a voter can express a preference against any such representation, is a matter properly left to the expertise of the Board, even though a question of statutory construction is obviously involved. Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed. 2d 788 (1958), upon which the Board relies for this argument, is not in point. There the dispute concerned which of two methods of financial cost accounting was required by a statute which specified neither, and the Supreme Court held that the Canal Company could determine the issue as it thought best, particularly since the President and the Congress had been fully advised of the Canal Company's method of accounting. 356 U.S. at 318–319, 78 S.Ct. at 758. "[T]he question is so wide open and at large as to be left at this stage to agency discretion. The matter should be far less cloudy, much more clear for courts to intrude." Id. at 319, 78 S.Ct. at 758. Here, by contrast with the Panama Canal Co. case, the issue of statutory construction goes to the very center of the complicated mediation procedures outlined at length in the Railway Labor Act, with its clear and uncloudy emphasis upon majority determination of the issue of representation. The form of ballot prescribed by the Board is a clear "mistake of law," and judicial review is thus appropriate. Id. at 318, 78 S.Ct. at 757.

The Board has also cited to the Court certain language from the recent case of WES Chapter, Flight Eng'rs' Ass'n v. National Mediation Bd., 314 F.2d 234 (D.C.Cir.1962).[1] The language immediately

---

1. "The need for a large degree of conclusiveness in the settlement of labor disputes over the question of employee representation in the transportation industry was met by Congress in the Railway Labor Act. Responsibility was given to

following that quoted by the Board, however, is more relevant to the issues now before the Court:

"Where courts have taken jurisdiction of such representation disputes the context has strongly indicated either that the Board by refusing to act had obliterated rights granted to employees by Congress or, turning now to a situation arising under the National Labor Relations Act, the Board had acted in excess of its delegated powers and contrary to a statutory provision which is 'clear and mandatory.' Leedom v. Kyne, 358 U.S. 184, 79 S. Ct. 180, 3 L.Ed.2d 210 (1958). When this occurs the courts 'cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers.' Id. at 190, 79 S.Ct. at 185." WES Chapter, supra, 314 F.2d at 236.

An election based upon use of the Board's present ballot would obliterate the right to vote for no collective bargaining representation, and would thus be contrary to the clear requirements of the Railway Labor Act's stated policy of majority determination.

Since the above points constitute the only issues raised by the Board in response to the Court's order to show cause why the preliminary injunction should not be made permanent, and since the Board in response to said order to show cause has raised no disputed issue of fact on which a trial would be necessary, the Court will deny the Board's motion to dismiss or in the alternative for summary judgment, and will issue a permanent injunction for the reasons set forth in this memorandum and in the memorandum of May 3, 1963.[2]

This memorandum shall be considered as specific findings of fact and conclusions of law, supplemental to the findings of fact, conclusions of law, and memorandum of May 3, 1963, which findings, conclusions, and memorandum of May 3, 1963, are hereby readopted by the Court.

---

a board with special competence, in the effort to maintain enough harmony to prevent interruption of service. Congress sought to preclude litigation in the courts over what the Supreme Court has called an 'explosive problem.' Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 303, 64 S.Ct. 95, 98, 88 L.Ed. 61 (1943). The Court said Congress had taken 'great pains' to protect the Mediation Board in its handling of the problem. Consequently the courts have seldom intruded. [Citation of cases omitted.]" 314 F.2d at 236.

**2.** In reaching this conclusion, the positions advanced by the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employes, which union has been permitted to intervene in this action pursuant to Rule 24 (b), Fed.R.Civ.P., have been fully considered but have not been separately stated since they repeat, in summary form, issues fully argued by the Board and disposed of by the Court in its memorandum of May 3, 1963.