BROTHERHOOD OF RAILWAY & STEAMSHIP
CLERKS, FREIGHT HANDLERS, EXPRESS
& STATION EMPLOYEES *v.* ASSOCIA-
TION FOR THE BENEFIT OF NON-
CONTRACT EMPLOYEES.

No. 138. Argued March 4, 1965.—Decided April 28, 1965.*

---

*Together with No. 139, *United Air Lines, Inc.* v. *National Media-
tion Board et al.* and No. 369, *National Mediation Board et al.* v.
*Association for the Benefit of Non-Contract Employees,* also on
certiorari to the same court.

*James L. Highsaw, Jr.,* argued the cause for petitioner in No. 138. With him on the brief were *Milton Kramer* and *William J. Donlon.*

*Stuart Bernstein* argued the cause for petitioner in No. 139. With him on the brief were *H. Templeton Brown* and *Robert L. Stern.*

*Solicitor General Cox* argued the cause for petitioners in No. 369 and respondents in No. 139. With him on the briefs were *Assistant Attorney General Douglas, Daniel M. Friedman, Morton Hollander* and *John C. Eldridge.*

*Alex L. Arguello* argued the cause for respondent in Nos. 138 and 369. With him on the brief was *Jerome C. Muys.*

*Clarence M. Mulholland* and *Edward J. Hickey, Jr.,* filed a brief for the Railway Labor Executives' Association, as *amicus curiae,* urging reversal in Nos. 138 and 369 and affirmance in No. 139.

MR. JUSTICE CLARK delivered the opinion of the Court.

These consolidated cases involve claims of United Air Lines (United) and the Association for the Benefit of Non-Contract Employees of United (the Association), attacking the form of ballot that the Board intends to use in a representation election among United's employees under § 2, Ninth of the Railway Labor Act, 44 Stat. 577,

as amended, 45 U. S. C. § 152, Ninth (1958 ed.).[1]   United also contends that the National Mediation Board (Board) should hold a hearing under the same section, with its participation, to determine the appropriate craft or class in which the election should be held.   Before the Board the conflicting unions—Brotherhood of Railway and Steamship Clerks (Brotherhood) and International Association of Machinists (Machinists)—agreed that the appropriate craft or class in which the election should be held was "clerical, office, stores, fleet and passenger service employees"; over the objection of United the Board ordered an election in this unit to determine which union, if either, would be its bargaining representative.   United then filed suit against the Board raising the questions it presses here.   This case was dismissed and is here, after affirmance by

---

[1] Section 2, Ninth provides:

"If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier.   Upon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this chapter.   In such an investigation, the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier.   In the conduct of any election for the purposes herein indicated the Board shall designate who may participate in the election and establish the rules to govern the election, or may appoint a committee of three neutral persons who after hearing shall within ten days designate the employees who may participate in the election. . . ."   45 U. S. C. § 152, Ninth.

the Court of Appeals, as No. 139. After this dismissal the Association filed suit against the Board, the Brotherhood being permitted to intervene, and raised substantially the same claims. The District Court enjoined the Board from conducting an election with a ballot that did not permit an employee to cast a vote against collective bargaining representation; the other issues were remanded to the Board for further consideration. 218 F. Supp. 114. The Court of Appeals affirmed these cases by a divided court and they are here as Nos. 138 and 369. 117 U. S. App. D. C. 387, 330 F. 2d 853. Judge Wright, dissenting, thought the District Court was without jurisdiction to enjoin the Board from conducting a representation election, citing *Switchmen's Union* v. *National Mediation Board,* 320 U. S. 297 (1943). We granted certiorari in all three of the cases. 379 U. S. 814.

We hold that the Board satisfied its statutory duty to investigate the dispute; that United is not entitled to be a party to proceedings by which the Board determines the scope of the appropriate craft or class; and that the Board's choice of ballot for its future elections does not exceed its statutory authority and is therefore not open to judicial review.

## 1. The Facts.

In January 1947, after lengthy hearings in which United and other airlines participated at the request of the Board, it was determined that the "clerical, office, stores, fleet and passenger service" grouping of employees constituted an appropriate craft or class, within the meaning of the Act, for collective bargaining purposes. Case No. R–1706, N. M. B. Determinations of Craft or Class 423 (1948). All of the parties here, save the Association, participated in this public hearing. Since that time they have participated in other cases involving the same questions decided in R–1706, but, with some exceptions, the

Board has continued through the years to hold elections in that craft or class.

In August 1962 the Brotherhood filed with the Board an application under § 2, Ninth to investigate a representation dispute among employees of United. In its original application the Brotherhood proposed to exclude those stores and fleet service personnel then represented by the Machinists. After the Board had advised United and the Machinists of the Brotherhood's application each informed the Board that in its opinion the application should be dismissed because it did not conform to what the Board had found to constitute a craft or class in Case No. R–1706, *supra.* Alternatively, United requested that if dismissal was not in order the Board should hold hearings to determine the proper craft or class in which the election should be held. Upon receiving notice of this opposition the Brotherhood amended its application to include the full craft or class approved in R–1706. The Machinists then agreed that this was the appropriate unit in which to conduct the election.

The Board concluded that a dispute existed requiring an election and scheduled one for January 1963. It proposed to use its standard form of ballot which provided for the printing of the names of the labor organizations— in this case, the Brotherhood and the Machinists—with a box below each name for the employee to check the representative preferred. A third space was provided in which the employee could write in the name of any other organization or individual he wished to represent him. There was not a place on the ballot in which the employee could vote specifically for "no union."

The Board, on December 19, 1962, directed that a list of the employees involved be supplied by United not later than January 14, 1963. On January 11 United advised that the request was premature and requested a hearing as to the scope of the unit involved in the Brotherhood's

amended application. It outlined in some detail the past practices of the Board in dealing with such requests and attacked the continued suitability of the R–1706 determination, asking that the case be re-opened and that the group be divided into three separate crafts or classes. On January 17 the Board denied this request. It pointed out that United on September 7, 1962, had objected to the craft proposed in the Brotherhood's original application on the sole ground that it did not conform to R–1706; that the Brotherhood had then amended its request to conform with R–1706; that United had been notified of this change on October 8, 1962; that on October 24 the Board had requested United to furnish the number of employees in the craft or class as amended and that it had furnished this information on November 2, stating that there were 12,451 as of a given date; and that it had failed to furnish the names of the employees. The Board then commented that "the carrier is not a party to this representation dispute"; that "no request for a review of . . . Case No. R–1706, et al. has been received from either organization party to NMB Case No. 3590" (the pending application of the Brotherhood); and that United's request was "not timely made, since the Board, on December 19, 1962, found that a representation dispute existed among the employees in this craft or class, and has authorized an election." United requested reconsideration of this decision, but without success.

Meanwhile, on January 18, 1963, when United advised the Board that it was "willing to allow a ballot box election on Company property provided the ballot follows the form used by the National Labor Relations Board," *i. e.,* the ballot "would have a space for the employee to vote *against* representation as well as space for the employee to vote *for* representation" by the Brotherhood or the Machinists. (Emphasis in the original.) The Board replied that its form of ballot had been used since 1934

and that it saw no reason to depart from it. Thereafter United advised that it would furnish the list of employees by February 11, but on that date the list was refused and action was begun the next day against the Board in the District Court for the District of Columbia. This case was later dismissed, as we have noted.

It appears that while the election was being delayed the Association was being organized among United's employees. By March 1963 it claimed 6,400 members, about 50% of the total number of United's employees. It sought, like United, to be heard in a craft or class proceeding and to have the ballot amended. It stated, however, that it did not seek recognition as a bargaining representative, and it did not want its name on the ballot. It intended to dissolve after the election. The Board denied the applications.

After United's case was dismissed, the Association filed a similar suit in the same court, seeking substantially the same relief. The Brotherhood was permitted to intervene, and it filed a separate appeal from that of the Board after the court had disposed of the case as we have already stated.

After we granted certiorari, the Board adopted an amended form of ballot on which there appears the following directly above the names of the unions seeking election as representative:

"INSTRUCTIONS FOR VOTING

"No employee is required to vote. If less than a majority of the employees cast valid ballots, no representative will be certified."

In effect, this amended ballot stated on its face what has been the practice of the Board in these elections since its inception. The Board has announced its intention to use this form of ballot in future representation elections, including any that may be held in this particular matter.

## 2. THE PURPOSES OF THE ACT AND THE BOARD'S FUNCTION.

The major objective of the Railway Labor Act, 44 Stat. 577, as amended, 45 U. S. C. §§ 151–188 (1958 ed.), was "the avoidance of industrial strife, by conference between the authorized representatives of employer and employee." *Virginian R. Co.* v. *System Federation No. 40*, 300 U. S. 515, 547 (1937). Section 2, Ninth set up the machinery for the selection of the representatives of employees. It authorized the National Mediation Board, upon request, to investigate disputes over representation; to "designate" those who were affected; to use a secret ballot or any other appropriate means of ascertaining the choice of employees; to establish rules governing elections and to certify the representatives so chosen to represent the employees in negotiations. Upon the issuance of this certificate the employer, under the Act, is required to "treat" with the representative certified to it by the Board. As we said in *Virginian R. Co.*: "The statute does not undertake to compel agreement between the employer and employees, but it does command those preliminary steps without which no agreement can be reached. It at least requires the employer to meet and confer with the authorized representative of its employees, to listen to their complaints, to make reasonable effort to compose differences—in short, to enter into a negotiation for the settlement of labor disputes such as is contemplated by § 2, First." *Id.*, at 548.

In *Switchmen's Union* v. *National Mediation Board*, 320 U. S. 297 (1943), the petitioner sued for the cancellation of a Board representation certificate. The Court held that the Act precluded review of the Board's certification of a collective bargaining representative under § 2, Ninth. The case involved a question of statutory con-

struction, *i. e.*, whether the Act permitted the division of crafts or classes of a single carrier into smaller units for collective bargaining purposes. The Court refused to consider the merits of the claim, holding that it was for the Board, not the courts, finally to resolve such questions. "The Act in § 2, Fourth," the Court said, "writes into law the 'right' of the 'majority of any craft or class of employees' to 'determine who shall be the representative of the craft or class for the purposes of this Act.' That 'right' is protected by § 2, Ninth which gives the Mediation Board the power to resolve controversies concerning it and as an incident thereto to determine what is the appropriate craft or class in which the election should be held." *Id.*, at 300–301. The Court goes on to note that Congress decided on the method which might be employed to protect this "right"; and that where Congress "has not expressly authorized judicial review," *id.*, at 301, "this Court has often refused to furnish one even where questions of law might be involved," *id.*, at 303. The Court's conclusion was that "the intent seems plain—the dispute was to reach its last terminal point when the administrative finding was made. There was to be no dragging out of the controversy into other tribunals of law." *Id.*, at 305. Thus, the Court held there could be no judicial review.

It is sometimes said that in *Leedom* v. *Kyne,* 358 U. S. 184 (1958), the Court created an "exception" to the doctrine of *Switchmen's Union.* In *Kyne,* it was held that the law afforded a remedy in the courts when unlawful action by the National Labor Relations Board inflicted injury on one of the parties to a bargaining dispute. But this was no exception to *Switchmen's Union.* Rather the Court was careful to note that "[t]his suit is not one to 'review,' in the sense of that term as used in the Act, a decision of the Board made within its jurisdiction. Rather it is one to strike down an order of the Board

made in excess of its delegated powers and contrary to a *specific prohibition in the Act." Leedom v. Kyne,* 358 U. S. 184, 188. (Emphasis supplied.) The limited nature of this holding was re-emphasized only last Term where we referred to the "narrow limits" and "painstakingly delineated procedural boundaries of *Kyne." Boire v. Greyhound Corp.,* 376 U. S. 473, 481 (1964). It is with these principles in mind that we turn to the questions in the instant cases.

### 3. The Craft or Class Determination.

The order of the District Court in Nos. 138 and 369 enjoins the Board from conducting an election "in which the form of the ballot does not permit a voting employee to cast a vote against collective bargaining representation . . . ." The Association concedes that the order does not enjoin the holding of the election until the Board reconsiders its craft or class determination; nor has it petitioned here for a review of that portion of the decision. Thus, we need not reach the question of the Association's right to demand or participate in proceedings leading to such a determination.

The same is not true of United, however, for it specifically sought and was denied such relief, and it comes here contending that this denial constituted error. United argues that since the Act compels it to treat with the representative chosen by the majority of its employees in the craft or class in which the election is held, it has a direct and substantial interest in the scope of that unit; and that since the Act provides for no administrative or judicial review, due process requires that it be accorded an opportunity to participate in the proceedings by which the Board determines which employees may participate.

It also contends that the Board, in designating the employees who could participate in the election, did not do so as a result of the statutorily required investigation—

which, United contends, requires that the Board take evidence and make findings—but made an arbitrary determination, relying solely on the agreement of the unions.

United's position is that *Switchmen's Union* does not control a claim that the Board has ignored an express command of the Act. This particular question was reserved in the 1943 cases. In *General Committee* v. *Missouri-Kansas-Texas R. Co.*, 320 U. S. 323 (1943), a companion case to *Switchmen's Union,* the Court stated: "Whether judicial power may ever be exerted to require the Mediation Board to exercise the 'duty' imposed upon it under § 2, Ninth and, if so, the type or types of situations in which it may be invoked present questions not involved here." *Id.,* at 336, n. 12. We think that the Board's action here is reviewable only to the extent that it bears on the question of whether it performed its statutory duty to "investigate" the dispute.[2] Reviewing that action, however, we conclude that the contention is completely devoid of merit.

Section 2, Ninth makes it the duty of the Board to "investigate" a representation dispute and "to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names

---

[2] Indeed in the keystone case dealing with the Railway Labor Act, *Virginian R. Co.* v. *System Federation No. 40, supra,* the validity of the Board's certificate was attacked because it failed to recite the number of eligible voters in the craft or class in which the election was held. The Court found it unnecessary to decide whether the certificate would be conclusive absent such a finding, but it commented:

"But we think it plain that if the Board omits to certify any of them [the facts concerning the number of eligible voters, the number participating and the choice of the majority], the omitted fact is open to inquiry by the court asked to enforce the command of the statute. . . . Such inquiry was made by the trial court, which found the number of eligible voters and thus established the correctness of the Board's ultimate conclusion." *Id.,* at 562.

of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier." This command is broad and sweeping. We should note at the outset that the Board's duty to investigate is a duty to make such investigation as the nature of the case requires.[3] An investigation is "essentially informal, not adversary"; it is "not required to take any particular form." *Inland Empire District Council* v. *Millis,* 325 U. S. 697, 706 (1945). These principles are particularly apt here where Congress has simply told the Board to investigate and has left to it the task of selecting the methods and procedures which it should employ in each case.

In dealing with the sufficiency of the investigation it is necessary to examine the experience of the Board through the years in resolving questions of craft or class appropriateness. That experience, insofar as it concerns the unit involved here, dates back to 1946 in Case No. R–1706, *supra,* when it was called upon for the first time to apply the craft or class principle of representation to the airline industry. At that time it had before it a fledgling industry, a relatively new statutory command and a huge group of employees for whom there were no recognized crafts or classes within the meaning of the Act. At least five unions were involved, all urging different employee groupings, and all of the major airlines were invited to participate in an extended public hearing. United was among those participating and in fact supported the very craft or class unit which the Board eventually decided upon and to which it has adhered here. Because it was the first time the Board had recognized such a craft or class, it cautiously provided in denying reconsideration of its determination that it was subject

---

[3] *Ruby* v. *American Airlines, Inc.,* 323 F. 2d 248, 255; *WES Chapter, Flight Engineers' Int'l Assn.* v. *National Mediation Board,* 114 U. S. App. D. C. 229, 232, 314 F. 2d 234, 237.

to future re-examination where to do so would further the purposes of the Act.

Thereafter began a period in which the workability of the R–1706 determination was tested in practice, and it did not go completely unchallenged. In 1948 United voluntarily recognized the Machinists as the collective bargaining representative for its ramp and stores employees. It supplied the Board with evidence upon which this recognition was based and its reasons for departing from its usual policy. It is noteworthy that the Board replied that voluntary recognition would not preclude future determination by the Board of the proper craft or class to which those employees would belong. In 1951 the determination of R–1706 withstood challenge in *Matter of Representation of Employees of Northwest Airlines, Inc.,* Case No. R–2357, 2 N. M. B. Determinations of Craft or Class 60 (1955). United submitted a statement in this proceeding, emphasizing its disagreement with the R–1706 decision and requesting that it be disregarded. The Board refused to do so, but it did reiterate what it had implied in 1947—that it was "of the opinion that upon proper application . . . it will be advisable to reexamine the determination in case R–1706 et al., with the view of making such modifications as may be found to be justified at that time." *Id.,* at 67. We note that in both cases—R–1706 and R–2357—the unions competing for representative status were in disagreement as to the appropriate unit in which elections should be held. Again in 1952, in Case No. R–2482, 2 N. M. B. Determinations of Craft or Class 72 (1955), United participated when the Air Line Dispatch Clerks Association sought to represent its general dispatch clerks, dispatch clerks A, B, and C and crew schedulers; the Brotherhood there disputed the grouping, contending that R–1706 established the scope of the election. The Board sustained this position, which was also that of

United, and held that R–1706 should be adhered to.
United had argued that the dispatch clerks and schedulers
were not a separate craft or class but merely components
of the R–1706 unit, and that representation could be had
only through investigation and election in that group.
The Board ultimately discussed the application in these
terms:

"The precedents heretofore established by the Board,
however, cannot be disregarded. Moreover, the rec-
ord of stable industrial relations which has followed
in the years since the Determination in R–1706 must
be given due and careful consideration.

". . . In an industry which is still expanding, the
agency charged with the duty of certifying designated
representatives for collective bargaining must of
necessity hesitate before acquiescing in the desires
of certain employees to establish small segregated
groups, because by that very course it may retard, or
even destroy job opportunities. Flexibility in the
use of employee talent carries just as many advan-
tages for the employees as it does for the carrier.
The Board is fully aware that the action taken herein
will have, as an end result, the withholding of an
immediate opportunity to select a collective-bargain-
ing agent by this group of employees, but neverthe-
less, it is convinced that the basic purposes of the
Railway Labor Act will be better served by adher-
ence to the policy of preserving established crafts or
classes." *Id.,* at 76.

Nor do the subsequent cases brought to our attention
strip the R–1706 decision of its continuing validity. In
both these matters—Cases No. C–2252 and C–2389, 3
N. M. B. Determinations of Craft or Class 16 (1961)—the
Board determined that stock and storeroom employees
were separate crafts or classes of employees at North Cen-
tral and Trans-Texas Air Lines. Neither of these airlines

had participated in the 1946 proceedings. Both were feeder lines, and in both cases the contending unions disagreed as to the appropriate unit in which the election should be held. In any event, the Board was simply pursuing the policy it had announced when it decided R–1706—that it would re-examine craft or class determinations when it thought the purpose of the Act would be furthered thereby. This in itself belies the notion that the Board has blindly followed the R–1706 ruling.[4]

It is in light of this background that we must decide whether the Board's reaffirmation of the R–1706 determination in these cases was made after a sufficient investigation, within the meaning of the Act. We reject the contention that it adhered solely to the craft or class chosen by the unions. Time and again it has acknowledged that it has the task of determining the appropriateness of a craft or class, and nothing in this case suggests that it abdicated that responsibility here. Where units untested by actual collective bargaining have been proposed by the unions involved the Board has consistently held hearings to determine the propriety of holding elections in those crafts or classes. But where the unions have agreed and the unit they have agreed upon has been one well-established in industry bargaining circles, it has usually held elections without full-scale hearings, not simply because the unions agree but because the unit upon which they agree is one that is well-recognized under prior determinations of the Board and has proven satisfactory in actual experience. This is what it did here.

---

[4] It should be noted, however, that in nearly all cases subsequent to Nos. C–2252 and C–2389, the Board has held elections among clerical, office, stores, fleet and passenger service employees without re-examining that grouping and without noticeable protest. Mr. Thompson, Executive Secretary of the Board, lists 19 such cases in his affidavit in the District Court supporting the Board's motion to dismiss. This hardly supports United's contention that the Board is clinging in this case to a determination it has found obsolete.

The Board received the Brotherhood's application; it requested, received and considered statements from the carrier and the Machinists. On the basis of these preliminary actions, it scheduled an election. But it continued to correspond with United, accepting and studying its detailed application for reconsideration of the Board's decision to proceed to election in the R–1706 craft or class. Viewed alongside prior experience with the R–1706 grouping in the air transport industry this procedure clearly complied with the statutory command that the Board "investigate" the dispute. The only missing element of the required investigation is the election and that can now be held promptly.

United sought to have the District Court require the Board to hold a hearing on the craft or class issue in which it would participate as a "party in interest." But the Act does not require a hearing when the Board itself designates those who may participate in the election. It provides that "the Board shall designate who may participate in the election . . . , or *may* appoint a committee of three neutral persons who *after hearing* shall within ten days designate the employees who may participate in the election." (Emphasis supplied.) Indeed, United seems aware of this, for it stated in its brief that if "the Railway Labor Act does not specifically require a hearing, it does require an 'investigation,' " and that United must be heard in the course of that proceeding. Clearly, then, the Board cannot be required to hold a hearing.

Nor does the Act require that United be made a party to whatever procedure the Board uses to define the scope of the electorate. This status is accorded only to those organizations and individuals who seek to represent the employees, for it is the employees' representative that is to be chosen, not the carriers'. Whether and to what extent carriers will be permitted to present their views on

craft or class questions is a matter that the Act leaves solely in the discretion of the Board.

The gist of United's claim, therefore, is that it should be accorded a greater role in the Board's investigation. This argument must be rejected. Here United participated in the proceeding establishing the craft or class in question as a cognizable grouping of employees, and it has had opportunities since that time to present further evidence. It must be remembered that United is under no compulsion to reach an agreement with the certified representative. As Chief Justice Stone said in *Virginian R. Co.* v. *System Federation No. 40, supra,* "The quality of the action compelled, its reasonableness, and therefore the lawfulness of the compulsion, must be judged in the light of the conditions which have occasioned the exercise of governmental power." *Id.,* at 558–559. Likewise, as the Court observed in *Hannah* v. *Larche,* 363 U. S. 420, 442 (1960), the procedural requirements in a particular proceeding depend on "[t]he nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding . . . ." The Board, as we noted in *Switchmen's Union,* performs the "function of a referee." It does not select one organization or another; it simply investigates, defines the scope of the electorate, holds the election and certifies the winner. Thus, while the Board's investigation and resolution of a dispute in one craft or class rather than another might impose some additional burden upon the carrier, we cannot say that the latter's interest rises to a status which requires the full panoply of procedural protections. We find support for this conclusion when we consider the burden that acceptance of United's contentions would visit upon the administration of the Act. To require fulldress hearings on craft or class in each representation dispute would fly in the face of Congress' instruction that

representatives should be certified within 30 days of invocation of the Board's services. It places beyond reach the speed which the Act's framers thought an objective of the first order.

In view of these considerations, we hold that the Board performed its statutory duty to conduct an investigation and designate the craft or class in which the election should be held and that it did so in a manner satisfying any possible constitutional requirements that might exist. Its determination, therefore, is not subject to judicial review. *Switchmen's Union* v. *National Mediation Board, supra.* As was pointed out there, the "highly selective manner in which Congress has provided for judicial review of administrative orders or determinations under the Act," *id.*, at 305, indicates the confidence that it reposed in the Board. In turn the fair and equitable manner in which the Board has discharged its difficult function is attested by the admirable results it has attained.

4. The Form of the Ballot.

As we have noted the District Court enjoined the Board from conducting an election with a ballot that did not permit an employee to cast a vote against collective representation. We believe this was error. Section 2, Ninth empowers the Board to establish the rules governing elections. Moreover, it provides that in resolving representation disputes the Board is authorized "to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier." Thus, not only does the statute fail to spell out the form of any ballot that might be used but it does not even require selection by ballot. It leaves the details to the broad dis-

cretion of the Board with only the *caveat* that it "insure" freedom from carrier interference. That the details of selecting representatives were to be left for the final determination of the Board is buttressed by legislative history clearly indicating as much.[5] See Hearings on H. R. 7650, House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess., 34–35.

In summary, then, the selection of a ballot is a necessary incident of the Board's duty to resolve disputes. The Act expressly says as much, instructing the Board alone to establish the rules governing elections. Thus, it is clear that its decision on the matter is not subject to judicial review where there is no showing that it has acted in excess of its statutory authority.

United and the Association, however, apparently relying on *Leedom* v. *Kyne, supra,* contend that the Board has exceeded its statutory authority in selecting the proposed ballot. The argument is that § 2, Fourth, which provides that "[t]he majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class" requires a ballot with

---

[5] The legislative history supports the view that the employees are to have the option of rejecting collective representation. The ballot that the Board proposes to use in future elections fully comports with this conception of the Act. Using the Board's ballot an employee may refrain from joining a union and refuse to bargain collectively. All he need do is not vote and this is considered a vote against representation under the Board's practice of requiring that a majority of the eligible voters in a craft or class actually vote for some representative before the election is valid. The practicalities of voting—the fact that many who favor some representation will not vote—are in favor of the employee who wants "no union." Indeed, the method proposed by the Board might well be more effective than providing a "no union" box, since, if one were added, a failure to vote would then be taken as a vote approving the choice of the majority of those voting. This is the practice of the National Labor Relations Board.

a "no union" box.  They urge that in *Virginian R. Co.* v. *System Federation No. 40, supra,* at 560, certification on the basis of a majority of the votes cast, rather than a majority of the eligible voters, was upheld on the ground that nonvoters "are presumed to assent to the expressed will of the majority of those voting."  And they say that the Board's ballot is inconsistent with this rationale. But the Board has not followed the presumption of *Virginian R. Co.*  Indeed the *caveat* on the face of the proposed ballot expressly refutes such an assumption.  The Board's rule of election procedure is that no vote is a vote for no representation, and this is now made plain to the voting employees.  It is, as we have said, an assumption more favorable to the employees that the Association represents.  Thus, under the Board's practice a majority of the craft or class, as required by § 2, Fourth, does have the right to determine who shall be the representative of the group or, indeed, whether they shall have any representation at all.

It is also claimed that since § 9 (a) of the National Labor Relations Act, 49 Stat. 453, as amended, 61 Stat. 143, 29 U. S. C. § 159 (a) (1958 ed.) and § 2, Ninth of the Railway Labor Act are both designed to encourage collective bargaining and the National Labor Relations Board uses a ballot with a "no union" box, the Mediation Board must use one also.  Even assuming that the "no union" ballot would implement the purpose of the Act, this is a far cry from saying that it is the only form of ballot that would do so.  Given broad discretion as it is the Mediation Board has followed a presumption contrary to that adhered to by the Labor Relations Board. The latter has tailored its ballot to conform to the presumption of *Virginian R. Co.*  If in a Labor Board election, an employee does not vote, he can safely be presumed to have acquiesced in the will of the majority of the voters.  In a Mediation Board election, if the em-

ployee refuses to vote he is treated as having voted for no representation.

We venture no opinion as to whether the Board's proposed ballot will best effectuate the purposes of the Act. We do say that there is nothing to suggest that in framing it the Board has exceeded its statutory authority.

Unable to point to any specific requirement of a "no union" ballot in the Act, United and the Association are left to arguing in terms of policy and broad generalities as to what the Railway Labor Act should provide. The very nature of the arguments indicates that the Board's choice of its proposed ballot is not subject to judicial review, for it was to avoid the haggling and delays of litigation that such questions were left to the Board. These are matters for Congress and the Board rather than the courts. Here the Board—a creature of Congress—has been, as we have said, careful to provide fair, yet effective procedures and we feel certain that it will continue to do so. If its decision on the ballot is not acceptable, the place to go is to Congress, not to us.

Accordingly, we reverse the judgments in Nos. 138 and 369 and affirm the judgment in No. 139.

*It is so ordered.*

MR. JUSTICE BLACK concurs in the result.

MR. JUSTICE STEWART, dissenting.

My dissent stems from the Court's approval of the form of ballot used by the National Mediation Board in representation elections. As I understand its opinion, the Court holds that the form of ballot devised by the Board is subject to judicial review, at least for the purpose of determining whether the Board "acted in excess of its statutory authority." With that I agree. But the Court goes on to hold that the ballot devised by the Board does conform with the statute. With that I cannot agree.

## I.

Nothing decided in *Switchmen's Union* v. *National Mediation Board,* 320 U. S. 297, forecloses a determination by this Court of the validity of the ballot form used by the Board. On the contrary, that case, which insulated from judicial review the Board's ultimate craft or class determinations, makes it all the more imperative that the Board be required to operate by fair and lawful procedures. Compare *Silver* v. *New York Stock Exchange,* 373 U. S. 341, 361. To say that *Switchmen's Union,* by interpreting the Railway Labor Act (44 Stat. 577, as amended) to deprive courts of jurisdiction to review class or craft determinations, also deprived courts of jurisdiction to review the fundamental procedures used by the Board in arriving at those determinations "would indeed be to 'turn the blade inward.'" *Graham* v. *Brotherhood of Firemen,* 338 U. S. 232, 237.

The ballot lies at the heart of the Board's certification mechanism. It is used day in and day out and will be used on thousands of occasions in the future. What happened in this very case illustrates the vital and salutary effect of judicial scrutiny of the Board's procedures. The ballot form which the Court of Appeals held illegal in this litigation had been used by the Board for many years. Yet the Solicitor General, as a consequence of the grant of certiorari in this case, persuaded the Board to modify the ballot to reduce its ambiguities.[1] If the Court were understood as holding today that there can be no review

---

[1] The Solicitor General's changes would leave the slots on the ballot intact (not supplying a "no union" box) but would append the following caption:

### "INSTRUCTIONS FOR VOTING

"No employee is required to vote. If less than a majority of the employees cast valid ballots, no representative will be certified."

It is this revised form of ballot which the Court today approves, rather than the old form which was before the Court of Appeals.

of the ballot's structure, the Board would, of course, be free to return to the older historic form which the Solicitor General has virtually conceded is unfair and unlawful.[2]

## II.

Even as revised in response to our grant of certiorari in this case, however, the form of ballot to be used by the Board continues to list spaces only for the organizations actually competing for representation, with a blank space left for writing in an unlisted organization. No space is provided for voting for "no union." Employees are still confronted with a ballot upon which they can mark a choice only among representatives, without an opportunity to mark a choice for no representative at all. This ballot form is directly attributable to the Board's view of what the bargaining pattern should be in the airline industry. The Board has stated that "the act does not contemplate that its purposes shall be achieved, nor is it clear that they can be achieved, without employee representatives . . . ."[3] As a result, the Board has designed its ballot to encourage employees to choose a labor organization to represent them collectively. I believe both the language of the Act and its legislative history belie this view and, for that reason, I would order the Board to reconsider the form of its ballot.

Section 2, Fourth provides that "Employees shall have the right to organize and bargain collectively through

[2] Before *Switchmen's Union* there were several decisions which furnished the National Mediation Board with clarifying interpretations of the Act. The Board found these "decisions are very helpful . . . in that they serve to settle issues which, in the past, have frequently arisen to trouble the orderly and prompt adjustment of disputes over representation between different factions among employees." Annual Report of the National Mediation Board, 1938, pp. 5–6.

[3] Administration of the Railway Labor Act by the National Mediation Board, 1934–1957, p. 15.

representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class . . . ." The Act performs the function, familiar to the rest of our labor legislation, of furnishing the opportunity for majority determination within each employee group of what the nature of bargaining shall be. But the Act is not compulsory. Employees are not required to organize, nor are they required to select labor unions or anyone else as their representatives. It has always been recognized that under the law the employees have the option of rejecting collective representation.

The House Report on the bill, stated:

"2. It [H. R. 9861] provides that the employees shall be free to join any labor union of their choice *and likewise be free to refrain from joining any union if that be their desire* and forbids interference by the carriers' officers with the exercise of said rights." (Emphasis supplied.) (H. R. Rep. No. 1944 to accompany H. R. 9861, Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess., 1934, p. 2.)

Much of the testimony on the bill was given by Commissioner Joseph B. Eastman, Federal Coordinator of Transportation and the principal draftsman of the legislation. His reply to a question by Congressman Huddleston reflects the contemporary understanding of the Act:

"Commissioner EASTMAN. No; it does not require collective bargaining on the part of the employees. If the employees do not wish to organize, prefer to deal individually with the management with regard to these matters, why, that course is left open to them, or it should be." (Hearings on H. R. 7650, House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess., 1934, p. 57.)

And in the Senate, Senator Wagner insisted that this was the burden of the bill:

"Senator WAGNER. . . . I didn't understand these provisions compelled an employee to join any particular union. I thought the purpose of it was just the opposite, to see that the men have absolute liberty to join or not to join any union or to remain unorganized.

"Mr. CLEMENT. That is the way we hope they will read when they are finally amended." (Hearings on S. 3266, Senate Committee on Interstate Commerce, 73d Cong., 2d Sess., 1934, p. 76.)

See also Hearings, *id.,* p. 12. That legislative history is directly counter to the conception of the Act reflected by the ballot form used by the Board, and spelled out in the particularized record of the present case.[4]

The form of the ballot is markedly different from that evolved by the National Labor Relations Board under a statute which contained almost identical wording at the time the ballot was designed.[5] Originally the Labor

---

[4] In a letter to United Air Lines, rejecting its objections to the form of the ballot, the Executive Secretary of the Board stated: "Introduction of a 'yes' or 'no' ballot would contribute to, if it did not actually encourage, an attempt to circumvent the mandate of Congress that representatives be designated by carriers and their employees for the purposes described in Section 2, First and Second of the Railway Labor Act . . . ." Letter to Charles Mason from Executive Secretary of the National Mediation Board, January 24, 1963.

[5] The original § 9 (c) of the Wagner Act, 49 Stat. 453, stated the Labor Board's powers in the following language:

"Whenever a question affecting commerce arises concerning the representation of employees, the Board may investigate such controversy and certify to the parties, in writing, the name or names of the representatives that have been designated or selected. In any such investigation, the Board shall provide for an appropriate hearing upon due notice, either in conjunction with a proceeding under

Board, like the Mediation Board, did not include a space for a "no union" vote. Since July 1937, however, it has consistently placed such a slot on the ballot to insure that an employee's vote for a particular representative does not spring from a feeling that the vying organizations present the only alternatives available. "The policy adopted by the Board is designed merely to make sure that the votes recorded for a particular representative express a free choice rather than a choice in default of the possibility of expressing disapproval of both or all proposed representatives." *In re Interlake Iron Corp.*, 4 N. L. R. B. 55, 61. "The Act . . . does not require an unwilling majority of employees to bargain through representatives. It merely guarantees and protects that

---

section 10 or otherwise, and may take a secret ballot of employees, or utilize any other suitable method to ascertain such representatives." Compare § 2, Ninth of the Railway Labor Act:

"If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. . . . In such an investigation, the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier. . . ." 45 U. S. C. § 152, Ninth (1958 ed.).

The similarity in the purposes of the Wagner Act and the Railway Labor Act was pointed out in the report of the House Committee on Labor which stated that "the bill is merely an amplification and further clarification of the principles enacted into law by the Railway Labor Act . . . ." H. R. Rep. No. 1147, 74th Cong., 1st Sess., p. 3. See 40 Op. Atty. Gen. 541 (Attorney General Clark).

right of a majority *if it chooses to exercise it." Ibid.* (Emphasis supplied.)

Certainly the Board may use alternate devices for divining the desires of the employees. But each device must be tested within its own framework. Where the Board purports to gain its information through the traditional system of balloting the employees, all parties rely on that election to yield a meaningful result. Here the Board decided to employ the secret ballot and rely on its results exclusively. At the least then, the ballot must unambiguously convey to each employee the choices available to him under the law.[6]

Because the National Mediation Board has hewn to the mistaken belief that its duty is to encourage collective representation in the airline industry, I would remand this case to the Board for further consideration in the light of the views here expressed. I would not attempt to dictate to the Board precisely what form the ballot should ultimately take. Within a broad range, that question surely lies within the Board's discretion. But it is a question the Board should confront with a correct understanding of the law.

---

[6] Prior to this litigation, the only court to consider the ballot employed by the National Mediation Board found that failure to include a "no union" slot deprived the employees of a "free choice." "It is manifest that this ballot did not present the issue to the eligible voters." *McNulty* v. *National Mediation Board,* 18 F. Supp. 494, 501 (D. C. N. D. N. Y.).