INTERNATIONAL IN–FLIGHT CATERING CO., LTD., Plaintiff-Appellee,

v.

NATIONAL MEDIATION BOARD, Defendant-Appellant.

INTERNATIONAL IN–FLIGHT CATERING CO., LTD., Plaintiff-Appellee,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION, et al., Defendants-Appellants.

INTERNATIONAL IN–FLIGHT CATERING CO., LTD., Plaintiff-Appellee,

v.

NATIONAL MEDIATION BOARD et al., Defendants,

and

International Brotherhood of Teamsters, Airline Division, et al., Defendants-Appellants.

INTERNATIONAL IN–FLIGHT CATERING CO., LTD., Plaintiff-Appellee,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION, et al., Defendants,

and

National Mediation Board, Defendant-Appellant.

Nos. 76–2652, 76–2749, 76–2897 and 76–2954.

United States Court of Appeals, Ninth Circuit.

June 10, 1977.

Rehearing and Rehearing En Banc Denied Sept. 15, 1977.

---

William Kanter, Michael H. Stein, U. S. Dept. of Justice, Washington, D. C., argued for National Mediation Bd.

Stephen H. Naiman, argued, Brundage, Beeson & Pappy, Los Angeles, Cal., Charles E. Murphy, argued, Michael G. Cleveland, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for plaintiff-appellee.

Airline Indus. Relations Conf., Murray Gartner, argued, Poletti, Freidin, Prashker, Feldman & Gartner, New York City, for appellant, amicus curiae.

Before MERRILL, WRIGHT and ANDERSON, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

In this case the National Mediation Board certified that the International Brotherhood of Teamsters, Airline Division, was the bargaining representative for the employees of International In-Flight Catering Co., Ltd. The district court below found that this certification failed to comply with Section 2, Ninth, of the Railway Labor Act [45 U.S.C. § 151, *et seq.*] and constituted an act contrary to the statute and in excess of the National Mediation Board's authority. Therefore, the court held the certificate was null, void and of no effect. We agree and affirm.

THE PARTIES

Plaintiff, International In-Flight Catering Co., Ltd. (IICC), an Hawaiian corporation, is a subsidiary of Japan Air Lines which operates certain routes within the United States. IICC employs approximately 220 hourly employees and is engaged in the business of providing food and beverage catering service to all Japan Air Lines and Korean Air Lines flights. IICC is a company owned or controlled by a carrier engaged in interstate commerce and is itself a "car-

rier" as that term is defined in the Railway Labor Act (RLA) [45 U.S.C. §§ 151, 181] and is therefore subject to the jurisdiction of the National Mediation Board.

Defendant, National Mediation Board (NMB) is an independent administrative agency of the United States, established to administer the provisions of the RLA and to effectuate its purposes.

Defendant, International Brotherhood of Teamsters, Airline Division (Teamsters) is an unincorporated association which exists, in part, to represent employees within the airline industry for collective bargaining over rates of pay, hours and working conditions, and is a labor organization subject to the provisions of the RLA and the NMB.

BACKGROUND

From the time of the IICC's creation in 1971, IICC's employees have remained unrepresented for purposes of collective bargaining by any labor organization. Early in 1974, the Teamsters solicited IICC's employees to sign cards entitled "REQUEST FOR EMPLOYEES REPRESENTATION ELECTION UNDER THE RAILWAY LABOR ACT." The text of these cards reads:

"I authorize the Airline Division of the International Brotherhood of Teamsters to request the National Mediation Board to conduct an investigation and a representation election, also to represent me in all negotiations of wages, hours and working conditions in accordance with the Railway Labor Act."

The Teamsters filed these signed cards with the NMB and requested that the NMB investigate whether IICC's employees desired to be represented by Teamsters or desired to remain unrepresented. In March, 1974, at the direction of the NMB, a mediator of the NMB checked the signature on the cards against copies of employee signatures contained in IICC's payroll records. In April, 1974, the NMB determined that a representation dispute existed among IICC's employees as to what organization or individual, if any, was the majority representative of the employees for collective bargaining purposes. To resolve that dispute, the NMB directed that a secret ballot election be conducted among IICC's employees to determine whether a majority desired to be represented by the Teamsters, or by another labor organization which had intervened in that proceeding (International Association of Machinists (IAM)), or desired no collective bargaining representative at all.

In May, 1974, the NMB certified to IICC, Teamsters, and IAM that the results of the election showed that less than a majority of the employees had cast ballots in favor of representation by any union. Thereafter, IICC's employees, in accordance with their desires, remained unrepresented for collective bargaining purposes.

After the results of the election were made known, the Teamsters *again* began soliciting IICC's employees to sign new cards identical to the ones previously submitted to the NMB. The record shows that the IICC employees who signed these cards were told that the card's purpose was to get another representation election. For example, in May or June, 1974, employee Glenn Nakamoto was told by Teamster Representative James T. Muraki that "if you sign the card we will have a re-election." He then signed the card. Nakamoto witnessed other employees signing cards at the same time after being told the purpose of the card was to get another NMB election at the Company. Employee Jean Miyoshi was solicited to sign the card and asked, "What is that for?" She was told by the Union solicitor, Jack Fukuzono, "We are going to have an election." She signed the card. Employee Juliette Bejgrowicz was told by Jack Fukuzono that the purpose of signing the card was to provide the Union with names and addresses for a mailing list. She signed the card after reading it because, "it was to get another election at IICC." Bejgrowicz saw other employees sign the cards after being told that the cards were for an election.

On November 12, 1974, the Teamsters, by its Honolulu representative, James T. Muraki, sent IICC's employees a letter stating, among other things, "The end result will be that an election will still prevail" and that

the employees would be given an opportunity to cast "a Democratic Vote for Union Representation."

On November 27, 1974, the Teamsters solicited IICC's employees by letter to sign the Request for Election Card and stated that "soon the Federal Government will set an election date. . . ." The letter also stated:

"In closing, a final reminder that also enclosed is a card entitled, 'Request for Employees Representation Election Under the Railway Labor Act'. *By signing this card it does not mean that you are voting for the Union.* It simply means that you are requesting the National Mediation Board to conduct a federally supervised election. This card is confidential and no one is allowed to see it except the Union and the Federal Government." (emphasis supplied) (C.R. 80)

Upon learning that the Teamsters had requested a second election, IICC filed suit seeking to stop such election on the ground that NMB regulations required a minimum of one year between elections. On November 12, 1974, the district court issued a TRO prohibiting the NMB from further processing of the Teamsters application. The TRO was continued by stipulation of the parties until December 23, 1974. On that date, after hearing arguments from all parties, the district court granted defendant NMB's Motion to Dismiss the complaint and denied plaintiff's request for a preliminary injunction.

IICC, on January 3, 1975, filed a Motion for Reconsideration. While this motion was pending, the NMB in February gave telegraphic notice that it intended to dispatch a mediator to conduct the initial field investigation to determine whether a representation dispute existed at IICC. Similar to the procedure followed in March, 1974, the NMB requested IICC to provide signature records of its employees so that they could be compared to signatures on the cards submitted by the Teamsters. On February 25, 1975, NMB and IICC entered into a written stipulation whereby IICC would supply the signature records of its employees and that NMB would "not conduct an election among plaintiff's employees, nor post any notices of election, nor mail or distribute any ballots to any employees of the plaintiff" (C.R. 85) until the district court ruled on the motion for reconsideration.

Near the end of February, 1975, IICC turned over to a mediator of NMB a list of all of its employees and copies of their signatures. The mediator compared these employee signatures with signatures on the cards submitted by the Teamsters and on March 2, 1975, submitted a report on the results of this check to the NMB.

On March 17, 1975, the district court denied the Motion for Reconsideration. On March 24, after receipt of the decision, NMB issued a telegram to both the Teamsters and IICC advising that NMB had determined that a representation dispute existed among IICC's employees. On this same date NMB, without holding any type of election, mailed a certification to IICC certifying Teamsters as the collective bargaining representative of IICC's employees. In this letter the NMB stated:

". . . in accordance with Section 2, Ninth, of the Railway Labor Act and based upon its investigation pursuant thereto, the National Mediation Board certifies that the International Brotherhood of Teamsters—Airline Division has been duly designated and authorized to represent, for the purposes of the Railway Labor Act, . . . , employees of the International In-Flight Catering Company, its successors and assigns." (C.R. 90)

Shortly after receiving the certification, IICC wrote to NMB, stating that the "authorizations" (the cards) signed by IICC's employees were not authorizations for representation but for an election instead. IICC also supplied NMB with the information and documents showing that the employees had been solicited to sign the cards on express oral and written assurances by the Teamsters that their sole purpose was to authorize an election. IICC then requested the NMB to investigate these facts, reconsider its certification and direct an immediate election.

On June 27, 1975, NMB denied the Motion to Reconsider, finding "no basis" for the motion and stating that the NMB had "carefully and thoroughly" considered all the points raised and that under all of the circumstances the certification upon the basis of authorization cards was an appropriate method of ascertaining the name of the representative of the employees.

On September 25, 1975, the NMB informed IICC that it would "commence mediation" to compel bargaining between IICC and the Teamsters. On October 27, 1975, an NMB mediator contacted IICC in an attempt to commence mediation.

Acting pursuant to Section 5, First, of the RLA, the NMB requested, on October 29, 1975, that IICC and the Teamsters agree to binding arbitration of the terms of a collective bargaining agreement. On October 31, 1975, the NMB issued a notice to IICC and the Teamsters which authorized the Teamsters to commence unilateral action against IICC on November 30, 1975, including strikes and picketing.

In sum, this situation can be simply stated this way: In 1974 the NMB, after request, found a representation dispute and held an election. When the vote did not present a majority vote for representation, then the NMB certified that there was no bargaining representative for IICC's employees. In 1975, after request, NMB again found a representation dispute. This time, however, they skipped the election and certified the Teamsters as the collective bargaining representative based solely on the cards signed by the employees who the record clearly shows were merely requesting a new election. As will be discussed below, this action exceeded the NMB's statutory authority, thereby rendering the certification of the Teamsters as bargaining representatives void and of no effect.

## PROCEEDINGS AND DECISION BELOW LEADING TO THIS APPEAL

On October 23, 1975, IICC filed suit in the District Court seeking a declaratory judgment of its rights and naming only the Teamsters as party defendant. After the

NMB attempted to compel mediation and, on October 31, 1975, released the Teamsters to engage in strikes and picketing against IICC, IICC filed an Amended Complaint on November 5, 1975, adding the NMB as a defendant. On November 7, 1975, the District Court granted IICC a TRO against both the Teamsters and the NMB enjoining them from seeking to enforce the NMB's certification. On April 9, 1976, the District Court granted IICC's request for a preliminary injunction. On July 8, 1976, the District Court entered its findings and conclusions granting IICC summary judgment as to Counts I and II of its Amended Complaint and denying the NMB and the Teamsters' motions for summary judgment.

In its conclusions of law the district court ruled that "Section 2, Ninth, of the RLA, 45 U.S.C. § 152 requires the NMB to conduct an adequate and bona fide investigation of each representation dispute it determines to exist and authorizes the NMB to issue a certification of representation only in those cases where its investigation establishes competent evidence" that a majority of the employees have chosen a representative.

The court found that the employees had been misled into signing the (Request for Representation Election) cards, that the cards were not competent evidence, and that the IICC had established a *prima facie* case that the NMB had failed to perform its statutory duty. The district court also held that it had jurisdiction to determine whether the NMB had performed this statutory duty and that IICC had standing to maintain the action. The district court granted IICC's motion for a permanent injunction and vacated the NMB's certification, finding it "null, void and of no effect" and held that IICC "need not recognize or bargain or engage in mediation or arbitration" with the Teamsters.

The NMB and the Teamsters appeal from the injunctive relief granted by the district court on April 9, 1976, and the final judgment entered July 8, 1976. On appeal they raise three issues:

1. Whether the district court properly had jurisdiction to review the present dispute.
2. Whether IICC had standing to maintain its action.
3. Whether disposition by summary judgment was appropriate.

## JURISDICTION AND THE STATUTORY DUTY TO INVESTIGATE

The NMB and the Teamsters contend that under the RLA any certification made by the NMB, pursuant to a representation dispute, is not reviewable by the courts. They rely on *Switchmen's Union of North America v. National Mediation Board*, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943). In *Switchmen's* there was a dispute over whether certain employees (yardmen) should be permitted to vote for separate representation or be compelled to take part in a system-wide election. The Switchmen's Union contended that yardmen in certain designated parts of the system should be permitted to vote for separate representatives. The NMB investigated the dispute and designated that all yardmen of the carriers were participants in the system-wide election. An election was held and another union was chosen as the representative. The NMB certified this union to the carriers as representative for collective bargaining under Section 2, Ninth, of the RLA. Upon certification, the Switchmen's Union brought action in federal court to have the certification cancelled. The Supreme Court, however, did not reach the merits of the controversy, holding that the final resolution rested with the NMB, not the courts.

As we read *Switchmen's,* the general rule is that certifications made by the NMB after its investigation are final and there will be "no dragging out of the controversy into other tribunals of law." (320 U.S. at 305, 64 S.Ct. at 99). We, of course, adhere to this rule. However, we find that reviewing a certification after an investigation by the NMB and reviewing whether the NMB made its statutory investigation at all are two completely different matters. While we cannot, and do not, review the former, we can and do review the latter.[1]

Section 2, Ninth, of the RLA [45 U.S.C. § 152] states in pertinent part:

"If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this Act, *it shall be the duty of the Mediation Board,* upon request of either party to the dispute, *to investigate such dispute* and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that may have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier." (emphasis supplied)

The question of whether judicial review was available to determine if the NMB had performed its statutory duty to investigate the dispute was expressly left open in *Switchmen's Union's* companion case, *General Committee v. Missouri-Kansas-Texas R. Co.*, 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76 (1943), where the court stated:

"Whether judicial power may ever be exerted to require the Mediation Board to exercise the 'duty' imposed upon it under § 2, Ninth and, if so, the type or types of situations in which it may be invoked present questions not involved here." (320 U.S. at 336, note 12, 64 S.Ct. at 152)

This question was presented and answered in *Railway Clerks v. Non-Contract Employees,* 380 U.S. 650, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1965), a case cited by both parties. In *Railway Clerks,* United Airlines

1. During a hearing on a motion for a TRO, counsel for the NMB conceded that the courts have jurisdiction to review the NMB's statutory duty. During argument counsel stated:

"All along I have conceded that the Court has jurisdiction to entertain the issue whether or not or at least to review the Board's decision where it has gone beyond statutory authority." (Reporter's Transcript, Vol. V., pp. 36–37)

contested the form of ballot that the NMB intended to use in an upcoming election. United also contended that the NMB had ignored the statutorily-required investigation. In deciding this latter question, the court found that United's claim was reviewable. The court stated:

"We think that the Board's action here is reviewable only to the extent that it bears on the question of whether it performed its statutory duty to 'investigate' the dispute."

The court went on to review the NMB's action and rejected United's contention.

In the instant case it is undisputed that the NMB undertook some limited form of an "investigation." They did compare the signatures on the Request for Election cards with the signatures from IICC's payroll records. It is the NMB's position that the scope and form of an investigation are matters within its discretion and once it is established that such an investigation has been undertaken, the ultimate outcome arising therefrom is not reviewable by the courts. NMB contends that its investigation, the signature check, revealed that a majority of IICC employees had chosen the Teamsters to represent them.

This position advanced by the NMB disregards the import of § 2, Ninth, of the RLA, and *Railway Clerks v. Non-Contract Employees, supra.* Both state that the NMB has a duty to investigate *the dispute.* The dispute, in this case, advanced by IICC was that the cards signed by the employees only called for an election and were not votes for representation without an election. The actual investigation undertaken by the NMB in merely comparing the signatures assumes the disputed point, that the cards represented votes.

During the district court proceedings the NMB maintained a "stonewall" approach to the investigation issue and failed to introduce any evidence whatsoever which disclosed the extent of their investigation, if any, other than the signature check of the cards. As mentioned above, IICC presented evidence from several of its employees who stated that they had been induced to sign

the cards on the ground that the cards were only a call for another election similar to the election held a year earlier. The district court noted in its findings of fact:

"The NMB has at all times refused to explain either to Plaintiff or to this court what investigation it conducted in this case, or to rebut Plaintiff's evidence that the sole evidence before the NMB at the time it issued the certification in this case was the Mediator's report based on the Mediator's February 26, 1975 examination of the [Request for election] cards submitted by the Defendant Teamsters. The NMB has declined this court's request that it state what investigation it conducted and any reasons for its findings and for its issuance of the certification in this case." (Clerk's Record 838–9)

From all of this it is not unreasonable to conclude that there was no investigation, for if there was, then the NMB would not have certified the Teamsters solely on the basis of the Request for Election Cards, especially when the NMB offered no evidence from which it could have concluded that the cards were proper ballots.

The NMB also ignored its own Mediator's Manual when it granted this certification based solely on the cards. Section 334.2 of the Manual states that disputes can be resolved based on the cards submitted, but *only if the carrier is willing.* The section then goes on to state:

"A statement *in writing* from the carrier concerning its willingness to accept a check of authorizations should be obtained." (emphasis supplied)

Whatever else may be said of prior case decisions, none of them address the facts of this case where simple, direct, plain language representations were made to IICC's employees and were ignored, and are still ignored by the NMB. We do not fault the Teamsters. They had a legitimate interest in having the employees sign the cards to request an election. Apparently they felt that with another election they could win a majority vote and become the bargaining representative for the employees. We do fault the NMB for its pertinacious adher-

ence to a position that flatly contradicts the intended meaning of the employees who had signed the Request for Election card, the plain language on the card itself, and the spirit of the RLA. It is a perversion of the search for truth and the policy of the RLA for the NMB to continue to insist, in these circumstances, that it conducted an investigation and discharged its duty under the RLA. The NMB assumed an adamant and unyielding stance below and maintained its intransigent position on appeal. This is further evidenced by its obstinate refusal to produce evidence before the district court, something it could have done with relative ease and without forfeiting or abandoning any legal position it has in this case. It would not have impeded this litigation and may well have resolved it at that point. This adamant position of the NMB and its counsel precluded the district court from taking "a peek" at the merits so that it could determine whether the NMB discharged its statutory responsibilities. *See, e. g., International Brotherhood of Teamsters v. Brotherhood of Railway Clerks,* 131 U.S.App.D.C. 55, 402 F.2d 196 (1968).

For the above-stated reasons, we agree with the district court when it held that the NMB's certification in this case failed to comply with the requirements of § 2, Ninth, of the RLA and constituted an act contrary to the statute and in excess of its authority thereunder, and is therefore null, void, and of no effect.

## STANDING

■ The NMB contends that the policy of the RLA sought to remove the employer from the bargaining representative selection process and that an employer has no interest in the question of which bargaining representative is selected. Therefore, the NMB argues that IICC lacks any standing

to maintain the suit. Generally speaking, the employer has no standing to become involved in the representation-certification process because it usually affects only the affairs between the employees and their representatives. We find, however, that the employer (IICC) here does have limited standing to challenge its having to deal with an unlawfully and improperly certified bargaining representative. This point was implicitly decided in *Railway Clerks v. Non-Contract Employees, supra.* There the employer had raised the issue of statutory duty to investigate. Had the Supreme Court felt there was an absolute rule against the employer's standing to challenge the NMB's statutory duty to investigate, it could have so stated. Instead it reviewed the employer's claim (though finding it without merit).

The statute, § 2, Ninth, requires that an employer "shall treat with the representative so certified as the representative" of the employees. If the employer does not "treat with" the certified bargaining representative, then he opens himself up to economic sanctions such as strikes and picketing. Indeed, it was the very threat of these actions which prompted IICC's suit below. IICC then is left with two choices, either "treat with" an unlawfully and improperly certified bargaining representative or risk economic sanctions. This is hardly an adequate or fair choice. We are firmly convinced that the course of conduct practiced here by the NMB created in IICC standing to seek judicial review on the narrow issue decided in this case.

## SUMMARY JUDGMENT

■ The NMB contends that summary judgment granted to IICC by the district court was inappropriate because the district court relied upon disputed facts.[2] The

2. We question the NMB's ability to claim on appeal that there were disputed facts below when at the trial court they expressly stated there were no material facts in dispute. For example, in the NMB's opposition to IICC's Motion for Summary Judgment, the NMB stated:

"Defendant National Mediation Board, by its undersigned attorneys, hereby oppose plaintiff's Motion for Summary Judgment. The grounds for this opposition are that (1) the Court lacks jurisdiction . . ., (2) the complaint fails to state a claim . . ., (3) plaintiff is not entitled to judgment as a matter of law *although there are no material*

NMB also suggests that if there is a remand, the proper inquiry should be into the legal sufficiency of the NMB's investigation.

Under Rule 56 of the Federal Rules of Civil Procedure, a party opposing summary judgment is obligated to come forward with evidence showing there is a dispute as to a material fact once the moving party has introduced evidence in support of its motion. Rule 56(e) provides in pertinent part:

> "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

As a litigant, whether by its own choice or involuntarily, the government and its officers, boards and agencies, cannot dictate which rules it will obey and which it will disregard. If they set a course to ignore a rule of the federal courts designed to dispose of litigation, then, like other litigants, they cannot complain if they founder on the shoals of, for example, Rule 56(e).[3] The NMB cannot now, in the face of statements below admitting no dispute as to material facts, recant and request a remand for a factual hearing. The NMB is bound by its own conscious decision.

The NMB, as we mentioned earlier, presented no evidence to the district court to suggest that it had adhered to its duty to investigate the dispute. IICC, on the other hand, presented evidence to show the existence of a dispute involving the cards signed by the employees. We find that the district court, with the evidence presented to it, and the fact that there were no "material facts

in dispute," properly disposed of this matter by summary judgment.

The judgment below is affirmed.

---

facts in dispute." (C.R. 644) (emphasis supplied)

**3.** Rule 81(a)(3), Fed.R.Civ.Proc., grants no exception to the United States, its agencies and officers. "This rule (Rule 56) is applicable to all actions, including those against the United States or an officer or agency thereof." Advisory Committee Note to Rule 56; *Wright & Miller,* Fed.Prac. & Proc., Civil, Secs. 1027, 2733 and Appendix. *United States v. Proctor & Gamble Co.,* 356 U.S. 677, 681, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958) (discovery rules).